**DALE H., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Office of Children's Services, Appellee.**

**No. S–13632.**

Supreme Court of Alaska.

July 9, 2010.

---

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant.

Laura Fox, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, CHRISTEN, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

A father challenges a superior court order finding his son, an Indian child under the Indian Child Welfare Act (ICWA), to be a child in need of aid and terminating his parental rights. We conclude that the record contains sufficient evidence to support the superior court's findings that: (1) the son was a child in need of aid; (2) the father failed to remedy the conduct or conditions placing the son at harm; (3) the State made active efforts to reunite the family; (4) returning the son to the father would likely cause the son serious physical or emotional harm; and (5) termination of the father's parental rights was in the best interests of the son. We therefore affirm.

## II. FACTS AND PROCEEDINGS

Dale is the father of Charlie,[1] the child at issue in this case. Charlie was born on May 1, 2007, to Dale and Betty. Charlie is an Indian child within the meaning of ICWA.[2]

---

1. We use pseudonyms throughout this opinion to protect the parties' privacy.

2. 25 U.S.C. § 1903(4) (2006).

### A. Dale's Incidents Of Domestic Violence Before Charlie's Birth

In 2005 Dale was charged with assault in the fourth degree against his then-girlfriend Lauren and pleaded no contest to disorderly conduct.[3] The judgment stated that it arose out of a domestic violence offense under Alaska Statute 18.66.990(3) and (5). The judgment required Dale to complete a state-approved program for the rehabilitation of perpetrators of domestic violence.[4]

In 2005 or 2006 Dale became involved with Betty. Betty had a son, Evan, from a previous relationship. Dale and Betty first came to the attention of the Office of Children's Services (OCS) when Evan suffered unexplained injuries while living with Dale and Betty. Evan suffered bruises, a broken foot, and a broken arm. OCS never determined how Evan was injured, although there was some suspicion that Dale had caused Evan's injuries.

In January 2007 Dale assaulted Betty, who was four months pregnant with Charlie. Although Betty told the responding officer that Dale had choked her, Dale told OCS that he had merely pushed her. Dale was charged with assault in the fourth degree and pleaded no contest. He was ordered to complete a state-approved domestic violence intervention program.

In February 2007 OCS took custody of Evan and began working with Dale and Betty. OCS established a case plan for Dale that required him to attend a behavioral assessment with LEAP, Inc. and to follow the recommendations of the LEAP assessment. Dale participated in the LEAP assessment. It recommended that Dale complete a state-approved domestic violence intervention program and undergo a substance abuse evaluation.

OCS's expert witness Judy Ringstad testified that a state-approved domestic violence intervention program usually lasts at least thirty-six weeks. Dale attended the LEAP alternatives to violence program orientation and one class. Dale stopped attending the LEAP program in July 2007. He indicated that he was concerned about the cost of the program, which OCS does not cover.

### B. July 2007: Charlie Is Placed In OCS Custody.

On July 12, 2007, two-month-old Charlie was thrown to the floor during an argument between Dale and Betty. Dale took Charlie and left the house, but did not seek medical attention for Charlie. He eventually dropped Charlie off with a babysitter; the babysitter notified OCS and took Charlie to the emergency room. Charlie was examined at the hospital and found to be uninjured.

As a result of this incident, OCS filed an Emergency Petition for Adjudication of Child in Need of Aid and for Temporary Custody. On July 17, 2007, the superior court found that there was probable cause to believe that Charlie was a child in need of aid and granted OCS temporary custody.

In November 2007 the parties entered into a stipulation under which the superior court adjudicated that Charlie was a child in need of aid. As part of the stipulation, Dale agreed to a case plan to work towards reu-

---

**3.** The 2005 judgment against Dale is not part of the appellate record. But the judgment is not subject to reasonable dispute and is capable of ready determination. Furthermore, various witnesses testified to the fact of the judgment without objection by Dale. We therefore take judicial notice of the judgment under Alaska Rules of Evidence 201 and 203.

**4.** The judgment ordered Dale to complete an "alternatives to violence program" pursuant to AS 12.55.101(a). AS 12.55.101(a)(1) authorizes a court to require a person convicted of a crime of domestic violence to participate in a program for "the rehabilitation of perpetrators of domestic violence that meet[s] the standards set by ...

the Department of Corrections." Although all state-approved domestic violence intervention programs follow standards set by the Department of Corrections, different terms are used throughout Alaska to describe the various state-approved programs. The courts and social workers in Fairbanks refer to the local program as an "alternatives to violence" program. In Anchorage, the programs are called "batterers intervention programs" or "domestic violence intervention programs." Except where we refer specifically to the Fairbanks alternatives to violence program, we generally use the terms "domestic violence intervention program" or "domestic violence program" in this opinion.

nification of the family. Dale's case plan required him to: (1) complete the LEAP alternatives to violence course; (2) complete parenting classes on newborn and toddler care; (3) complete a substance abuse evaluation; and (4) submit to random urinalysis (UA) testing as a means to show sobriety. The case plan also stated that the requirements were subject to modifications and additions.

### C. July 2007—May 2008: Dale's Efforts Toward Reunification While Living In Fairbanks

#### 1. Dale's visitation with Charlie after he is placed in OCS custody

After the July 12 incident, Dale left Betty and began to question his paternity of Charlie. OCS ordered a paternity test and counseled Dale to visit Charlie while the results of the test were pending. Dale told OCS that he was "just going to wait and wait for the results." The paternity test was completed on September 26, 2007, and the superior court established Dale's paternity on October 11, 2007.

Dale did not visit Charlie in the three months between July 17, 2007 and October 11, 2007.

OCS contacted Dale once his paternity was established to inquire whether he wanted to visit Charlie. OCS offered three visits a week, but Dale said he could only visit twice a week. In fact, he visited Charlie just once a week in the approximately three months between October 11 and Christmas. Dale testified that he did not increase his visits because of his work schedule and his desire not to inform his employer of his situation with OCS.

Dale's visits with Charlie dropped below the once-a-week level in the five months between January 2008 and May 2008. Dale testified that he visited infrequently because of scheduling conflicts with Betty's visits with Charlie and his belief that he could obtain custody of Charlie after OCS returned Charlie to Betty.

#### 2. Dale's participation in his case plan

Dale completed the substance abuse evaluation and also completed a recommended twelve-hour alcohol program. He had already completed one parenting class as part of his case plan with Evan but did not take additional OCS-recommended parenting classes.

Dale participated in UA testing in December 2007 and January 2008, but stopped participating after a clean test in January 2008. Although OCS reminded Dale that he had to continue participating in UA testing even after his one clean test, Dale stated that he did not have a problem with alcohol and did not need to do further UA testing.

Although he had started and then stopped attending the LEAP alternatives to violence program as part of his case plan for Evan, Dale did not complete the LEAP program while he was in Fairbanks. He began attending another state-approved program run by ABC, Inc. in September 2007, but stopped going after four or five classes.

### D. May 2008—November 2009: Dale Moves To Anchorage And Does Not Contact OCS With His Whereabouts.

In April 2008 Dale notified OCS that he had remarried and that he was going to move to Anchorage in May. OCS asked Dale for a forwarding address, and Dale said he would give OCS an address as soon as he arrived. OCS informed Dale that it would be assigning him a secondary case worker in Anchorage who could help him identify a state-approved domestic violence intervention program and that Dale could continue visitation with Charlie while in Anchorage.

Dale did not contact OCS after he arrived in Anchorage and had no contact with Charlie in the seven months between May 2008 and January 2009.

In June 2008 the superior court held a permanency hearing for Charlie. Because Betty was incarcerated and OCS could not contact Dale, OCS indicated that it intended to petition for termination of both parents' parental rights. In November 2008 OCS

filed a petition for termination of Betty's and Dale's parental rights.

### E. November 2008—July 2009: Dale's Later Efforts Towards Reunification While Living In Anchorage

#### 1. Dale's visitation with Charlie while in Anchorage

Dale contacted OCS in Fairbanks and supplied his contact information in November 2008, after he received notice of the termination petition. In December 2008 Dale's primary OCS social worker, Marie Tullar, arranged for Dale to begin long distance visitation with Charlie. Dale had monthly visits with Charlie at OCS's expense in the seven months between January and July 2009, with Dale flying to Fairbanks or Tullar flying Charlie to Anchorage. In March he had two visits with Charlie. OCS informed Dale that it could fly him to Fairbanks, or Charlie to Anchorage, only once a month but that OCS would reimburse Dale for additional visits if he drove to Fairbanks. OCS encouraged Dale to visit as often as he could.

Dale's primary social worker, Tullar, noted that Dale behaved appropriately with Charlie during his visits. OCS's plan was to gradually increase the frequency and length of visitation.

#### 2. OCS's failure to assign a second caseworker to Dale in Anchorage and Dale's further efforts on his case plan

In February 2009 Tullar requested that OCS assign a secondary social worker in Anchorage to Dale. Dale was not assigned one, and in April or May 2009 Tullar resubmitted her request. Dale was never assigned a secondary social worker in Anchorage; Tullar became Dale's de facto secondary social worker, seeing him at least once a month in conjunction with his visits with Charlie.

After Dale got back in contact with OCS in November 2008, Tullar informed him that he still needed to complete a state-approved domestic violence intervention program. Although Tullar was in charge of coordinating Dale's visits with Charlie, she did not assist Dale in identifying a program that would satisfy his case plan because she did not have

specific knowledge regarding what domestic violence programs were available in Anchorage.

Because OCS did not assign him a secondary social worker, Dale went to the Alaska Native Justice Center (ANJC) for assistance finding an appropriate domestic violence class. The ANJC informed Dale that it had a twelve-week "state-approved anger management" course that started in March 2009. Dale signed up for this course in February and informed Tullar that he was enrolled.

In May 2009 the ANJC course was disbanded because of low enrollment. Dale then contacted the Cook Inlet Tribal Council (CITC), where he enrolled in an emotion management class and a parenting class. Dale informed Tullar that he was enrolled in classes at the CITC, and faxed release forms so that the CITC could provide OCS with information about his participation and receive information about Dale from OCS. CITC never received Dale's information. At the time of trial, Dale had completed an eight-week parenting class and was in the middle of the emotion management class.

OCS testified that both the ANJC and the CITC programs were not state-approved domestic violence intervention programs and did not meet the requirements of Dale's case plan. Dale also would have been informed of the difference between a state-approved domestic violence intervention program and an anger management program when he attended the LEAP alternatives to violence orientation and the ABC orientation.

#### 3. Dale's domestic situation in Anchorage and OCS's stance on Charlie's reunification with Dale

In Anchorage, Dale lived with his new wife, Allison, and her five-year-old son, Ian. After Dale reestablished contact with OCS, Tullar saw a "glimmer of hope" that he could eventually be reunified with Charlie because Dale had "stated that he had gotten his life back on track, that he was married to a very stable woman [Allison]." Because of this hope, OCS filed a notice that it did not intend to go forward with the termination trial originally scheduled for May 2009.

In April 2009 OCS received two protective services reports alleging that Dale had physically abused Ian by choking him. Neither report was ever substantiated.

In May 2009 Dale and Allison had a fight. Allison slashed Dale's belongings and threw them off the deck of their apartment. Dale left and called the police, who arrested Allison. Because Ian had been present at the incident, OCS filed a protective services report. After the incident, Dale and Allison separated and Dale filed for dissolution.

As a result of the incidents in April and May, OCS decided to go forward with a termination hearing. In June and July 2009 OCS filed amended petitions for termination.

### F. July 2009: The Superior Court Terminates Dale's Parental Rights To Charlie.

From July 27 through July 29, 2009, the superior court held a trial on OCS's petition to terminate Dale's parental rights to Charlie. OCS presented testimony by two experts. Judy Ringstad testified as an expert in providing social work services to families with Native children, and Lisa Hay testified as an expert in assessing and treating domestic violence. At the conclusion of the trial, the superior court made oral findings on the record. The superior court later issued written Supplemental Findings and written Findings and Order Terminating Parental Rights.

The superior court found that: (1) Charlie was a child in need of aid under AS 47.10.011(1), (8), and (9); (2) Dale had not remedied the conduct or conditions that made Charlie a child in need of aid because he had not successfully completed a state-approved domestic violence intervention program, had not completed his UA testing program, and had not spent enough time with Charlie; (3) over the case as a whole, OCS had made active efforts to provide programs and services to reunite Charlie with Dale; (4)

Charlie was likely to suffer physical or emotional harm if returned to Dale; and (5) it was in Charlie's best interests to terminate Dale's parental rights.

The superior court then terminated Dale's parental rights to Charlie. Dale appeals.

## III. DISCUSSION

Before a court may terminate the parental rights of an Indian child under ICWA and Alaska's Child in Need of Aid (CINA) statutes and rules, OCS must prove five elements under various evidentiary standards. OCS must prove by clear and convincing evidence: (1) that the child is "in need of aid" under AS 47.10.011;[5] (2) that the parent failed, within a reasonable time, to remedy the conduct or conditions in the home such that returning the child would place the child at substantial risk of physical or mental injury;[6] and (3) that OCS made active efforts to provide remedial services designed to prevent the breakup of the Indian family.[7] OCS also must prove by evidence beyond a reasonable doubt (4) that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.[8] Finally, OCS must prove by a preponderance of the evidence (5) that termination of parental rights is in the best interests of the child.[9]

Dale argues that the superior court erred in finding that OCS met its burden of proving each of the five elements required to terminate his parental rights.

### A. Standard Of Review

 We review a superior court's findings of fact for clear error.[10] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us 'with a definite and firm conviction that a mistake

5. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

6. AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(ii).

7. 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

8. 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

9. CINA Rule 18(c)(3).

10. *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004) (citing *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

has been made.' " [11] We review de novo whether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules.[12] "Whether OCS made active efforts as required by ICWA is a mixed question of law and fact." [13]

### B. The Superior Court Did Not Err In Finding Charlie To Be A Child In Need Of Aid.

The superior court found by clear and convincing evidence that Charlie was a child in need of aid under AS 47.10.011(1),[14] (8),[15] and (9).[16] Dale appeals each of these findings.

A court may find a child to be in need of aid under AS 47.10.011(1) if "a parent or guardian has abandoned the child as described in AS 47.10.013." [17] Alaska Statute 47.10.013 states that "the court may find abandonment of a child if a parent ... has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult." Alaska Statute 47.10.013 also provides a non-comprehensive list of behaviors that may constitute abandonment.

■ The superior court found by clear and convincing evidence that Dale had abandoned Charlie under AS 47.10.011(1) by failing to "maintain regular contact with [Charlie]" [18] and by making "only minimal efforts to communicate or maintain regular visitation ... for at least a six month period." [19] Dale concedes that "there were periods of time when Dale did not have consistent visitation with Charlie." Indeed, Dale failed to maintain any sort of contact or visitation with Charlie for the eight months from May 2008 to January 2009.[20] The superior court's finding that Dale abandoned Charlie by failing to support or visit him was not clearly erroneous.

The superior court also found that Dale abandoned Charlie by failing "to participate in a suitable plan or program designed to reunify him with [Charlie]." [21] It found that Dale had failed to participate in his case plan because he had not participated in a UA testing program,[22] did not complete the state-approved domestic violence intervention programs he was referred to in Fair-

---

**11.** *Id.* (quoting *A.B.*, 7 P.3d at 950).

**12.** *Carl N. v. State, Dep't of Health & Soc. Servs.*, 102 P.3d 932, 935 (Alaska 2004) (internal citations omitted).

**13.** *Sandy B. v. State, Dep't of Health & Soc. Servs.*, 216 P.3d 1180, 1186 (Alaska 2009) (internal citations omitted).

**14.** AS 47.10.011(1) states that a court may find a child to be in need of aid if "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter."

**15.** AS 47.10.011(8) states, in part, that a child is a child in need of aid if "conduct by or conditions created by the parent, guardian, or custodian have ... placed the child at substantial risk of mental injury."

**16.** AS 47.10.011(9) states that a child is a child in need of aid if "conduct by or conditions created by the parent ... have subjected the child or another child in the same household to neglect." AS 47.10.014 defines "neglect" for the purposes of the statute.

**17.** AS 47.10.011(1) also requires that "the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter." The parties do not dispute that Betty was incarcerated for all relevant time periods to satisfy AS 47.10.011(1).

**18.** AS 47.10.013(2).

**19.** AS 47.10.013(3).

**20.** Dale also failed to maintain contact with Charlie for the three months from July to October 2007. He visited Charlie less than once a week between December 2007 and May 2008.

**21.** AS 47.10.013(4).

**22.** Dale argues that his failure to complete UA testing was not abandonment because UA testing should not have been part of his case plan. But Dale signed a stipulation agreeing that UA testing was part of an appropriate plan towards reunification. The superior court did not err in considering UA testing to be part of Dale's case plan.

banks,[23] and failed to contact OCS for months after moving to Anchorage.

The record shows that Dale did not meaningfully participate in his case plan. Dale does not dispute that he did not comply with the UA program. Instead, he stopped testing after one negative result, arguing that he did not need to continue testing even though OCS informed him that he did. Dale also does not dispute that he failed to contact OCS for six months after he moved to Anchorage in 2008.

Dale also did not complete a state-approved domestic violence intervention program while in Fairbanks. He attended an orientation for a state-approved domestic violence program, but stopped attending after one regular class. In September 2007 he began attending another state-approved program but stopped going after four or five classes.

Dale argues that the confusion about what type of course he had to take in Anchorage and OCS's failure to provide Dale with a social worker in Anchorage excuses his failure to complete a domestic violence intervention program. Dale's argument is unconvincing. Dale had been advised of the difference between a state-approved domestic violence program and an anger management program on at least two occasions, and he testified that he knew he was required to take a thirty-six-week program. In any event, by the time Dale left for Anchorage in May 2008, he had already abandoned Charlie by enrolling in and dropping out of two suitable programs identified by his social worker in Fairbanks.[24]

In sum, by the time Dale reestablished contact with OCS in November 2008, he had not even minimally participated in large portions of his case plan for over a year. We have affirmed a superior court's finding that a parent's failure to participate in a case plan for six months constituted abandonment.[25] The superior court's finding that Dale abandoned Charlie by failing to participate in his case plan without justifiable cause was not clearly erroneous.

The superior court's findings that Charlie was a child in need of aid under AS 47.10.011(1) were not clearly erroneous. Because only one statutory basis is sufficient for finding a child to be in need of aid in a termination proceeding, it is not necessary to address the superior court's other findings with respect to AS 47.10.011.[26]

### C. The Superior Court Did Not Err In Finding That Dale Had Not Remedied His Conduct Within A Reasonable Amount Of Time.

■ Before a court may terminate parental rights, it must find by clear and convincing evidence that the parent has failed to remedy the harmful conduct or conditions that placed the child at risk of harm.[27] In making its determination, "the court may consider any fact relating to the best interests of the child, including ... the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs." [28]

■ The superior court found by clear and convincing evidence that Dale's visits after January 2009 were "inadequate" to remedy the broken parent-child bond caused by

---

**23.** Dale also disputes that a state-approved course was required or suitable for his reunification plan. But Dale's case plan explicitly called for a "LEAP Alternatives to Violence" course and OCS informed Dale on numerous occasions that he needed to complete a state-approved domestic violence intervention program. Furthermore, Dale knew that his plan included a state-approved domestic violence intervention program, and he knew the difference between a state-approved program and other courses. The superior court did not err in considering a state-approved domestic violence intervention program to be part of Dale's case plan.

**24.** AS 47.10.013(4).

**25.** *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 951 (Alaska 2000).

**26.** *See Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 762 (Alaska 2009) (citing *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 67 P.3d 648, 651 (Alaska 2003)).

**27.** AS 47.10.088(a)(2).

**28.** AS 47.10.088(b)(1).

Dale's lack of contact with Charlie. The superior court also found that Dale's failure to complete a state-approved domestic violence intervention program and participate in UA testing showed that he had not remedied his conduct. The court found that Charlie could not wait for the amount of time it would take Dale to complete a state-approved domestic violence program and demonstrate his ability to live a violence-free life.

Dale argues that he remedied his abandonment of Charlie because he had consistent contact with Charlie after January 2009, attended classes when he arrived in Anchorage, and acted appropriately when confronted by domestic violence. OCS argues that Dale's once-a-month visits in 2009 were insufficient to establish the parent-child bond and were "too little, ... too late" for Charlie. OCS also argues that Dale had not remedied his abandonment because he did not complete a state-approved domestic violence intervention program as required by his case plan and because he did not complete UA testing.

The superior court did not err in finding that Dale's monthly visits beginning in January 2009 after his long absence were insufficient to remedy his abandonment of Charlie. Contrary to his arguments on appeal, Dale did not fully take advantage of the opportunities OCS gave him to visit. OCS paid for Dale to fly to Fairbanks or Charlie to fly to Anchorage once a month. But it also encouraged Dale to visit as often as he could and offered to subsidize additional visits if Dale drove to Fairbanks. Dale only drove to Fairbanks once or twice between January and July 2009. Once-per-month visitation for seven months was insufficient to remedy the abandonment caused by his lack of visitation for eighteen months.

Furthermore, even if Dale's visits with Charlie after January 2009 were sufficient to remedy his abandonment, he did not remedy the conduct in a reasonable period of time. A parent's attempt to resolve abandonment

by reappearing in his child's life only remedies the conduct if it occurs in a reasonable amount of time, and we have held that abandoning a child for one year before reappearing is unreasonable.[29] Social Worker Tullar stated that "[o]ne of the most important things for a child in their first year of life is attachment and bond with a parent." By the time Dale resumed visits with Charlie in January 2009, he had only visited Charlie regularly for two out of the eighteen months Charlie was in OCS custody. Dale did not reappear and begin visitation within a reasonable amount of time. The superior court's finding that Dale had not remedied his abandonment within a reasonable amount of time was not clearly erroneous.

The superior court also did not err in finding that Dale had not remedied his abandonment because he did not complete a state-approved domestic violence intervention program or UA testing. We have previously held that a court may base a failure to remedy finding on the prospect of a lengthy period of time before the child could be reunified with the parent.[30] Dale does not dispute that he did not complete a state-approved domestic violence program. Judy Ringstad, an expert at providing social work services to families with Native children, stated that Dale would have to complete a state-approved domestic violence program and show a period of violence-free living before OCS could return Charlie to him. She estimated that it would be a minimum of one year before Charlie could be placed with Dale.

Although Dale argues that his failure to complete a state-approved domestic violence program should be excused because of OCS's failure to assign him a secondary case worker in Anchorage, the record clearly shows that he knew that he had to take a thirty-six week state-approved course. According to Ringstad, Dale was also aware that he had a limited amount of time to complete the tasks of his case plan. It would be over a year before Charlie could be reunified with Dale, and that was "too long to ask of a toddler"

**29.** *M.W. v. State, Dep't of Health & Soc. Servs.,* 20 P.3d 1141, 1145 (Alaska 2001).

**30.** *Jon S.,* 212 P.3d at 763 (affirming failure to remedy finding in part because year and a half to

complete tasks for reunification was "just too long to ask of a toddler" who had been in custody for twenty-eight months).

who had already been in custody for two years.[31] The superior court's finding that Dale had not remedied his failure to participate in his case plan was not clearly erroneous.

### D. The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Family.

In order to terminate the parental rights to an Indian child, ICWA requires OCS to prove by clear and convincing evidence that it made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and that those efforts were unsuccessful.[32] We have held that "no pat formula exists for distinguishing between active and passive efforts" and have adopted a case-by-case approach for the active efforts analysis.[33] We have recognized the following distinction between active and passive efforts:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, [a]ctive efforts [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[34]

In evaluating whether OCS met its active efforts burden, the superior court may consider "a parent's demonstrated lack of willingness to participate in treatment."[35]

The court should also look to OCS's "involvement in its entirety."[36]

The superior court found that, over the case as a whole, OCS had made active efforts to provide remedial programs to reunite Charlie with Dale. It found that OCS had provided ample remedial services to Dale in the form of a substance abuse assessment, a UA testing program, a behavioral assessment resulting in the recommendation that he complete a state-approved domestic violence program, and opportunities for visitation.

Dale argues that the superior court erred in finding that OCS had made active efforts to prevent the breakup of his family. He argues that OCS failed to make active efforts between November 2008 and July 2009 by failing to assign him a secondary case worker in Anchorage. He argues that a secondary caseworker could have assisted him in engaging appropriate services in Anchorage, namely finding a state-approved domestic violence program.

Although the court acknowledged that OCS's efforts fell below the required level for the spring of 2009 because it did not direct Dale to the correct domestic violence program in Anchorage, it found that OCS provided "exemplary" visitation by offering to pay for mileage if Dale drove to Fairbanks to visit Charlie. It also found that social worker Tullar made "phenomenal" efforts by flying and escorting Charlie to visit Dale in Anchorage, including on her personal time.

The superior court found that:

> [Dale] himself frustrated OCS's efforts to provide the necessary remedial services and programs . . ., first by not completing either of the [domestic violence] courses, nor participating in his UA program, then

**31.** *See id.*

**32.** 25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B).

**33.** *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks omitted) (citing *A.M. v. State,* 945 P.2d 296, 306 & n. 12 (Alaska 1997)).

**34.** *Id.* (quoting Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 157–58 (1984)).

**35.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, Dep't of Family & Youth Servs.,* 19 P.3d 597, 603 (Alaska 2001)).

**36.** *Id.*

moving 350 miles away from [Charlie], and then by failing to contact OCS or let them know where he had gone until the following November. . . . [I]n light of the case as a whole and of [Dale's] dropping out of his child's life only to reappear late in the process, and the child's age and needs, OCS's lapse in effort so late in the case does not vitiate this court's findings of active efforts over the whole of the case.

We find the court's conclusion to be amply supported by the record and hold that, over the case as a whole, OCS made active efforts to provide remedial services to reunite Charlie with Dale.

### E. The Superior Court Did Not Err In Finding That Returning Charlie To Dale Was Likely To Result In Serious Emotional Or Physical Injury To Charlie.

In order to terminate parental rights to an Indian child, ICWA requires the State to prove beyond a reasonable doubt that returning the child to the parent will likely result in serious emotional or physical damage to the child.[37] To prove that Dale's custody of Charlie would likely result in emotional or physical damage to the child, OCS must prove that Dale's conduct is likely to harm Charlie and that Dale is unlikely to change his conduct.[38] "These two elements can be proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."[39]

The superior court found that there was evidence beyond a reasonable doubt that Dale's "propensity to resort to violence" and his failure to complete a remedial domestic violence program placed Charlie at great risk of physical injury and "almost certain" to suffer emotional injury if returned to Dale.

The superior court's finding that Dale has a "propensity to resort to violence in his intimate relationships" is supported by the evidence and expert testimony. Dale has a documented history of domestic violence and there was additional evidence presented at trial that implicated Dale in other incidences of domestic violence.[40] Charlie would obviously be at risk of physical and emotional injury if Dale continued to use violence in his personal relationships even if Charlie is not the target of the violence. Lisa Hay testified that just being exposed to domestic violence can be injurious to a child.

The superior court's finding that Dale was unlikely to change his conduct because he did not complete his case plan is also supported by the evidence and expert testimony. Both Judy Ringstad and Hay testified that Dale would have to complete a state-approved domestic violence program in order to change his conduct. Ringstad also testified that a ten-week course like the one that Dale had participated in—which was not a state-approved program—would be insufficient to address the pervasive domestic violence issues in his life.

Dale argues that the superior court's conclusion is not properly supported by expert testimony because OCS's experts relied on unreliable information and assumptions. But our review of the trial transcript shows that OCS's experts based their opinions on admissible evidence. Ringstad based her opinion on "several incidences of domestic violence," including Dale's 2005 assault charge and his 2007 arrest for assaulting Betty. Hay likewise based her opinion partially on Dale's 2005 and 2007 arrests, stating that she would be concerned about his propensity for violence based solely on the two incidents. Moreover, the information that experts rely on in offering their opinions need not be admissible, but must be of a type reasonably relied on by experts in the partic-

37. 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

38. *See E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002).

39. *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000) (internal citations omitted).

40. Although Dale has only two domestic violence judgments, two incidents are sufficient to comprise a "history of perpetrating domestic violence." *See* AS 25.24.150(h).

ular field.[41] The superior court did not err in relying on Hay's and Ringstad's expert opinions.

We hold that the superior court did not err in finding that there was evidence beyond a reasonable doubt that returning Charlie to Dale would likely result in emotional or physical harm to Charlie.

### F. The Superior Court Did Not Err In Finding That Terminating Dale's Parental Rights Was In Charlie's Best Interests.

The superior court found by a preponderance of the evidence that terminating Dale's parental rights was in Charlie's best interests. It found that Charlie's bond with his foster parents, with whom he had been placed almost his entire life, and his bond with his half brother Evan weighed against reunification with Dale.

 We have previously affirmed a superior court's "best interests" finding based primarily on the strong bonds that a child has developed with his foster family.[42] Ringstad testified that a parent-child bond is important for a young toddler like Charlie because "he needs to be bonded and achieve permanency . . . in his life so that he can feel safe. And in that way, he will develop and grow and thrive." The superior court's finding that Charlie had formed strong bonds with his foster family is amply supported by the evidence. Ringstad testified that Charlie was "happy" and "thriving" in his placement with his foster parents and half brother. Tullar testified that Charlie was very attached to his foster family.

Dale argues that he had "bonded" with Charlie but his assertion is not supported by the evidence. Dale only had monthly short visits with Charlie in 2009 and had visited sporadically the year before. Furthermore, Tullar testified that, while Charlie seemed to enjoy his visits with Dale, "the attachment [was] not there." Dale's failure to contact OCS for six months after moving to Anchorage and his failure to drive to Fairbanks to take advantage of additional visitation is further evidence that Dale did not have a strong parent-child bond with Charlie. The superior court's finding that it was in Charlie's best interests to terminate Dale's parental rights was not clearly erroneous.

### IV. CONCLUSION

For the reasons explained above, we AFFIRM the superior court's order terminating Dale's parental rights to Charlie.

WINFREE, Justice, not participating.

---

41. Alaska R. Evid. 703.

42. *Jeff A.C., Jr. v. State,* 117 P.3d 697, 707 (Alaska 2005); *In re Adoption of Bernard A.,* 77 P.3d 4, 8 (Alaska 2003).