NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ADDY S., | ) | |
| | ) | Supreme Court No. S-17257 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-16-00349 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1733 – July 17, 2019 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Emily L. Jura, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices. Carney, Justice, dissenting.

## I. INTRODUCTION

A mother with mental health issues and an intellectual disability challenges the superior court's termination of her parental rights, alleging that the Office of Children's Services (OCS) failed to make active efforts to prevent the breakup of her

---

\*      Entered under Alaska Appellate Rule 214.

Indian family. OCS's efforts in this case were not ideal, but because we conclude that OCS's efforts were active in light of the mother's failures to engage with her case plans and cooperate with her caseworkers, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Mother's Relevant History Prior To Daughter's Birth

The mother in this case, Addy S.,[1] previously was a child in need of aid. Addy's mother used alcohol and drugs during her pregnancy, and Addy experienced "fetal distress" during delivery. Addy was developmentally delayed as a child and experienced neglect and extensive physical, psychological, and sexual abuse. Addy was later diagnosed with fetal alcohol spectrum disorder (FASD), post-traumatic stress disorder, major depressive disorder, and an intellectual disability.

Addy has had a guardian for much of her adult life. In May 2015 a public guardian from the Office of Public Advocacy (OPA) was appointed for Addy.[2] Addy lacked a stable living situation over the next 17 months. When the OPA guardian met Addy, she was living in a motel. The OPA guardian secured Addy housing in a facility for people with mental illnesses and special needs. There Addy met and began dating Clayton, a registered sex offender. Addy was later evicted for violating the facility's rules. The OPA guardian then found Addy subsidized housing in an apartment complex. At some point in late 2015, while living at the apartment complex, Addy became pregnant. Addy soon left her apartment, either voluntarily or because she was evicted

---

[1] We use pseudonyms to protect the family members' privacy.

[2] Alaska Statute 13.26.311(a) allows a court to appoint a public guardian for an "incapacitated person." An "incapacitated person" is "a person whose ability to receive and evaluate information or to communicate decisions is impaired . . . to the extent that the person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance." AS 13.26.005(5).

for allowing Clayton to live with her. Addy then was homeless for a time, occasionally sleeping outside a homeless shelter. Before giving birth, Addy apparently moved in with her mother, who lived in the Matanuska-Susitna Valley.

During Addy's pregnancy, the OPA guardian became concerned about Addy's ability to parent a child. After communicating with Addy's former foster father, her former guardian ad litem, and the medical center where she was receiving prenatal care, the OPA guardian reported these concerns to OCS in March 2016. The OPA guardian reportedly believed that Addy was a "sociopath" whose baby would not survive if she were permitted to take the baby home and that she may have been using drugs and abusing animals.

Separate from the OPA guardian, a nurse in the Southcentral Foundation's Nutaqsiivik nursing program also was concerned about Addy's ability to parent. Addy was referred to the program early in her pregnancy by a medical provider. As part of the program, registered nurses visit mothers during their pregnancies and the first two years of their babies' lives to provide parenting information and support. After visiting with Addy several times during her pregnancy, the nurse was concerned about Addy's perceived lack of insight into her baby, her unstable living situation, and how she was being treated by her then-boyfriend Cameron. The nurse apparently relayed these concerns to Addy's OPA guardian.

### B. Astrid's Birth And OCS's Petition For Emergency Custody

On June 30, 2016, Addy's OPA guardian submitted a high-priority protective services report to OCS about Addy's child's impending birth. Astrid was born on July 1. Astrid is an "Indian child" within the meaning of the Indian Child Welfare

Act (ICWA) because Clayton, Astrid's father, has Chevak and Yup'ik heritage and Addy has Curyung heritage.[3]  Clayton was in jail when Astrid was born.

After speaking with Addy's OPA guardian and Clayton's mother, OCS sent an initial assessment worker to interview Addy at the hospital on July 1.  The assessment worker asked Addy what she would do if Astrid started to cry.  Addy responded that she would talk to Astrid, tell her everything would be fine, walk around with her, and call someone if she continued to cry.  Addy did not mention that she would check to see if Astrid was hungry or if her diaper needed to be changed.  The assessment worker determined that Addy lacked problem-solving skills and knowledge necessary to care for a newborn.  The assessment worker also determined that it would not be possible to implement a protective action plan allowing Astrid to safely stay with Addy.  The only person Addy was able to identify to participate in the plan was her mother, who OCS determined could not ensure Astrid's safety due to the mother's history as a parent whose child was found to be in need of aid.

Shortly after the assessment worker interviewed Addy, OCS assumed emergency custody of Astrid.  Astrid was discharged from the hospital into the custody of Anchorage foster parents on July 2.

### C.    OCS's Efforts

Because the sole issue in this case is whether OCS made active efforts to reunify the family, we recount OCS's efforts below.

---

[3]    *See* 25 U.S.C. § 1903(4) (2012) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe . . . .").

**1.    Prior to Addy's consent to adoption (July 2016 through February 2017)**

Addy was assigned the same OCS caseworker from July 2016 through April 2017.  Addy consistently stayed in contact with her first caseworker.  The caseworker testified at Addy's parental rights termination trial about the safety concerns OCS identified for Astrid.  One concern was that Addy's then-boyfriend, Cameron, was a registered sex offender.  OCS also was concerned about Addy's housing situation and her ability to parent.  The caseworker and Addy formulated a case plan in October 2016 designed to address some of these concerns.  The plan had three main goals for Addy: (1) re-engaging in mental health treatment; (2) improving her parenting skills; and (3) finding a stable living situation and a way to support herself and Astrid.

To assist Addy in re-engaging in mental health treatment, the caseworker included contact information for Mat-Su Health Services on her case plan.  The caseworker does not appear to have followed up to confirm whether Addy engaged in treatment.  Addy's second caseworker testified at the termination trial that she did not know if Addy engaged in treatment during this time, because there were no releases in her file allowing her medical providers to share information with OCS.  The first caseworker never mentioned the topic of releases during her testimony.  The first caseworker scheduled a neuropsychological evaluation for Addy in November 2016, but Addy canceled it.  The first caseworker testified that she never rescheduled the evaluation, but the record indicates it may have been rescheduled for February 2017.

The first caseworker assisted Addy in improving her parenting skills by referring her to parenting classes and providing once-a-week, two-hour-long visitations with Astrid.  Addy was inconsistent in engaging with the parenting skills components of her plan.  Addy attended two parenting classes in July 2016 and one peer counseling session in November 2016; she did not attend another class until April 2018.  Addy's

visits with Astrid initially were supervised by a nurse from the Nutaqsiivik program, but, after a few visits, Addy stated that she no longer wanted to participate in the program. Addy apparently thought the nurse's presence was interfering with her ability to spend time with Astrid.

Addy appears to have had difficulty securing reliable transportation to get to her weekly visits with Astrid. The visits initially alternated each week between Anchorage, where Astrid was placed, and the Matanuska-Susitna Valley, where Addy lived. From August 2016 through February 2017, out of at least 21 visits Addy was offered with Astrid, Addy called to cancel or did not show up to 7 of them and was late to 4 others, including some visits close to her home. The first caseworker attempted to send Addy a bus pass to assist with transportation, but she refused to provide her address. The first caseworker eventually was able to arrange for Addy to pick up the bus pass at a bus station in Wasilla. The first caseworker did not provide Addy any other transportation-related assistance.

Addy apparently made no progress finding a stable living situation during this period. Although the OPA guardian had a duty to seek appropriate housing for Addy,[4] those efforts were stymied by Addy's refusal to tell the OPA guardian where she was staying. The guardian testified that, due to OPA policy, the guardian was not able to send Addy rent money during this time because OPA did not know where she was living or who her landlord was.

---

[4] *See* AS 13.26.316(c)(1) ("[T]he guardian . . . shall assure that the ward has a place of abode in the least restrictive setting consistent with the essential requirements for the ward's physical health and safety.").

**2. During the period when Addy consented to adoption (February 2017 through September 2017)**

In February 2017 Addy signed a form consenting to Astrid's adoption by her foster parents.[5] Addy relocated to Fairbanks after signing the form, and she and the first caseworker fell out of contact. In June 2017 Addy gave birth to a second child. OCS assumed custody of that child shortly after birth.

Addy's second caseworker for Astrid's case took over in April 2017. The caseworker tried to contact Addy several times over the next few months but was unsuccessful because OCS lacked current contact information. At the termination trial Addy's attorney suggested that the caseworker should have been able to get Addy's contact information from OCS staff working on the second child's CINA case. The caseworker claimed to have tried that, but the second child's caseworker also was having trouble contacting Addy.

The second caseworker for Astrid's case nonetheless created a new case plan for Addy in August 2017. Because Addy had consented to Astrid's adoption, the only goal was for Addy to maintain contact with OCS.

**3. After Addy withdrew her consent to adoption (September 2017 through August 2018)**

Addy withdrew her consent to Astrid's adoption at the end of September 2017.[6] The second caseworker was able to contact Addy for the first time shortly after that, in October 2017, at a contested placement review hearing for Astrid. Addy and the caseworker completed an updated case plan over the phone because Addy was not able

---

[5]     *See* AS 25.23.040(a)(1) (generally requiring mother's consent for court to grant adoption petition).

[6]     *See* 25 U.S.C. § 1913(c) (allowing parent in ICWA case to withdraw adoption consent prior to entry of final adoption decree).

to meet in Anchorage. This third case plan was completed in November 2017 and included four goals for Addy: (1) to continue working on her mental health; (2) to improve her parenting skills; (3) to develop a relationship with Astrid; and (4) to maintain contact with OCS. The caseworker testified that she wanted to keep the case plan simple and not overwhelm Addy.

Addy does not appear to have worked as well with the second caseworker as with the first. Addy sometimes missed meetings with the second caseworker, and she refused to sign releases, asserting that she already had done so. The second caseworker testified that, because Addy refused to sign releases, OCS never was able to confirm whether she had completed any of her case plan's mental health goals. OCS obtained a court order for Addy's medical records in January 2018, but the second caseworker either did not know about the order or did not obtain any records from it. When asked why a neuropsychological evaluation was not scheduled for Addy, the second caseworker testified that her supervisor typically required a parent to obtain a low-level mental health evaluation before approving a neuropsychological evaluation.

To help Addy develop parenting skills, the second caseworker again referred Addy to parenting classes. Addy did not resume attending classes until April 2018. From April through July 2018, Addy completed one or two classes per month on several topics, including child development, "emotion coaching," and first aid. Addy's visits with Astrid appear to have resumed around December 2017, but Addy's attendance was sporadic. Addy was offered at least 26 visits between December 2017 and August 2018; she missed 12 of them. The caseworker began making reminder calls before Addy's OCS appointments to encourage her attendance.

Addy's second caseworker left OCS in April 2018. Addy's case was reassigned to an OCS supervisor from April through June 2018. The supervisor met with

Addy only once in that time, and the supervisor does not appear to have made any referrals or followed up with any of Addy's service providers.

Addy was assigned a fourth OCS caseworker in June 2018. This caseworker appears to have had difficulty contacting Addy both by phone and in person. Addy missed some scheduled visits with this caseworker, and Addy's phone number changed at least once after June 2018. The caseworker created a fourth case plan with Addy in July 2018, again including goals related to Addy's mental health, parenting skills, contact with OCS, and housing and employment. The caseworker expressed that she did not want to overwhelm Addy by putting too many items on the case plan. Like the first case plan, Addy's fourth case plan required her to get a neuropsychological evaluation.

The fourth caseworker was able to get Addy to sign releases for information from Mat-Su Health Services and Addy's parenting class provider. But Mat-Su Health Services apparently did not respond to a request for information about the services Addy was receiving. The caseworker helped Addy with some of her transportation issues by getting her a bus pass and arranging a taxi for her to get to court on at least one occasion.

Lack of health insurance apparently prevented Addy from following through with her case plan's mental health goals. The fourth caseworker discussed with Addy her progress in signing up for Medicaid, but Addy said that she did not need the caseworker's assistance completing the application. Although OCS could have paid for Addy to have a neuropsychological evaluation, it apparently elected not to. The fourth caseworker asserted that OCS could have made additional referrals if it had received a neuropsychological evaluation or mental health assessment.

**D. ICWA Expert Testimony**

Several of Addy's arguments are based on opinions expressed by OCS's ICWA expert. The ICWA expert testified that she did not think classroom-based parenting instruction would be helpful for someone with FASD who has difficulty taking in and processing auditory information. The expert noted that some Anchorage organizations provided hands-on, in-person parenting instruction. The expert also testified that Addy's once-a-week visitation with Astrid was "not sufficient to promote bonding or to really practice [parenting] skills" because it was too short and infrequent. The expert emphasized the need for individualized counseling and coaching for Addy's mental health issues, given her disabilities. The expert also listed some strategies to accommodate Addy's lack of insight into her own capabilities, including meeting her outside of OCS's office and setting up a system to help her manage her appointments.

**E. Superior Court's Active Efforts Findings**

Addy's parental rights termination trial occurred over three days in August 2018. At the close of trial, the superior court made oral findings on the record, and it followed up later with written findings. The court concluded that Astrid was a child in need of aid due to both abandonment[7] and Addy's mental health issues preventing her from being a safe parent.[8] The court determined that Addy's conduct constituted abandonment under AS 47.10.013(a)(3), because she had failed to maintain regular visitation with Astrid for a period of at least six months, and under AS 47.10.013(a)(4), because she had failed to participate in a suitable plan designed to reunite her with Astrid.

---

[7]     *See* AS 47.10.011(1).

[8]     *See* AS 47.10.011(11).

The superior court also found by clear and convincing evidence that OCS made active efforts to prevent Addy and Astrid's family breaking up and to promote their reunification. The court acknowledged that OCS's efforts "were not ideal" but concluded that they nonetheless constituted active efforts. The court pointed to OCS's efforts to help Addy by creating case plans; providing transportation assistance; attempting to complete a Medicaid application; offering a neuropsychological evaluation; obtaining information releases; and arranging parenting classes and visitation. The court concluded that OCS's efforts were hampered by Addy's lack of cooperation and failure to keep in contact with her caseworkers.

Addy appeals only the superior court's determination that OCS made active efforts to reunite her with Astrid.

## III. STANDARD OF REVIEW

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[9] Because Addy has not challenged any of the superior court's factual findings, we "review de novo whether [those] findings satisfy the requirements of the CINA and ICWA statutes and rules."[10]

## IV. DISCUSSION

Addy argues that OCS's efforts were not active because it failed to: (1) develop a case plan that was appropriate to the circumstances of her case, particularly given her disabilities, or offer necessary services to effect reunification; and (2) actively assist her in implementing her case plan. We address each argument below.

---

[9] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

[10] *Id.* (quoting *Dale H.*, 235 P.3d at 210).

### A. OCS's Case Plans, Although Not Ideal, Were Appropriate For The Circumstances Of Addy's Case And Reasonably Designed To Promote Reunification.

Addy contends that her case plans were deficient in several ways and that these deficiencies constitute a failure to provide active efforts. She argues that OCS failed to provide active efforts because it did not direct its efforts toward what had caused Astrid to be in need of aid: Addy's lack of parenting knowledge and her disabilities. Relying heavily on the ICWA expert, Addy argues that testimony demonstrated that she would have required frequent contact to bond with Astrid and in-home support services to learn how to safely parent. Addy further contends that OCS's initial decision to place Astrid with a foster family in Anchorage, instead of with a family in the Matanuska-Susitna Valley, contributed to Addy's inability to bond with Astrid and that we should take the placement into account when evaluating OCS's efforts. Addy also argues that OCS's failure to address her unhealthy relationship with Cameron in its case plans contributed to her failure to "develop the protective skills she ultimately needed to reunite with Astrid."

"To terminate parental rights to an Indian child, the trial court must find by clear and convincing evidence that OCS has made active efforts 'to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.' "[11] The Bureau of Indian Affairs' 2016 regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[12] OCS

---

[11] *Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1070-71 (Alaska 2018) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009)).

[12] 25 C.F.R. § 23.2 (2016).

must tailor its efforts to the parental problem that led a child to be in need of aid and "take into account the parents' limitations or disabilities and make any reasonable accommodations."[13] When evaluating whether OCS made active efforts, we "look to OCS's 'involvement in its entirety.' "[14] Although OCS's efforts as a whole must be "active," we review its individual treatment and rehabilitation decisions for reasonableness.[15] We have held that "OCS is not required to refer a parent to specific support programs"[16] and that it "has discretion to prioritize which services should be provided to a parent based upon the issues identified in her case."[17] We consider "a parent's demonstrated unwillingness to participate in treatment as a factor in determining whether OCS met its active efforts burden."[18]

After reviewing OCS's efforts as a whole, we conclude that they were, barely, active. Because Addy lacked parenting knowledge, it was reasonable for OCS to start with less frequent and heavily supervised visits before increasing their frequency and duration. Given Addy's intellectual disability, it likewise was reasonable for OCS

---

[13] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1116 (Alaska 2010) (quoting *In re Terry*, 610 N.W.2d 563, 570 (Mich. App. 2000)).

[14] *Pravat P.*, 249 P.3d at 271 (quoting *Dale H.*, 235 P.3d at 213).

[15] *See, e.g.*, *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 529 (Alaska 2013) ("OCS was not unreasonable in its approach of postponing some treatment decisions until the parents had completed a psychological assessment.").

[16] *Id.*

[17] *Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018).

[18] *Pravat P.*, 249 P.3d at 271.

to wait to increase the complexity of her case plan until she had demonstrated success with the initial plan. As the superior court noted in its oral findings: "There's no telling where this case would have gone had [Addy] taken advantage and done the work that was suggested that be done on her case plan."

OCS's ICWA expert likely was correct that Addy would have benefitted from hands-on, individualized parenting instruction. But the ICWA expert's testimony did not clearly establish that alternative programs were available and appropriate given Addy's disabilities and living situation. And Addy rejected hands-on instruction from the Nutaqsiivik nurse who had been attending her visitation sessions. Addy's apparent unwillingness to receive parenting instruction weighs in favor of finding that it was reasonable for OCS not to continue providing such instruction.[19]

Astrid was adjudicated in need of aid both due to Addy's mental health issues and her abandonment of Astrid. Addy was never consistent about visitation or attending parenting classes, and her visits with Astrid stopped entirely for the approximately seven-month period when Addy was in Fairbanks. There is no evidence in the record that her failure to attend visits or classes was due to her disabilities. The evidence instead indicates that Addy would call to cancel visitation appointments because of her difficulties with securing reliable transportation. Addy does not dispute that OCS made several attempts to help her with transportation. Nor does she explain how her disability was related to abandoning Astrid.

Because OCS provided repeated efforts to assist Addy with transportation, we also disagree that Addy's is the "rare case" in which OCS's placement decision

---

[19] *Id.* ("The court . . . may consider a parent's demonstrated unwillingness to participate in treatment as a factor in determining whether OCS met its active efforts burden.").

indicates a failure to provide active efforts.[20]  OCS attempted to make visits easier for Addy by arranging for Astrid's foster parents to take her to visit Addy in the Matanuska-Susitna Valley.  Addy failed to attend some of these visits, and they stopped entirely when Addy moved to Fairbanks.  Although placing Astrid in Anchorage may have made visits more difficult for Addy, Anchorage was accessible via public transportation.  And two of Addy's caseworkers gave Addy bus passes and attempted to help her find the correct bus route to get to Anchorage.  OCS's attempts to help Addy with transportation were frustrated by her claims that she did not need help with transportation, and her refusal to give OCS an address for her caseworker to mail her a bus pass and help her determine the correct bus route.

We also reject Addy's argument that OCS's failure to include case plan goals relating to her relationship with Cameron prevented her from developing the "protective skills" necessary to reunite with Astrid.  Addy's caseworkers were concerned about her relationship with Cameron and foresaw it as a future barrier to her reunification with Astrid.  But OCS reasonably prioritized strengthening Addy's relationship with Astrid before addressing Addy's relationship with Cameron.[21]  Although Addy's relationship with Cameron ultimately might have prevented Astrid from being placed in Addy's home, it does not appear she ever was close to achieving that goal due to her failure to consistently attend parenting classes and visits.  OCS appropriately used its

---

[20]    *See David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 779 (Alaska 2012) ("We recognize the possibility that cases may exist in which OCS's early placement decisions may directly impact the ability of parents to fulfill the requirements of their case plans and thus may be part of OCS's active efforts . . . .").

[21]    *See Demetria H.*, 433 P.3d at 1071 n.25 ("OCS has discretion to prioritize which services should be provided to a parent based upon the issues identified in her case.").

discretion to prioritize Addy's general parenting knowledge over deficiencies in her living situation when it created her case plans. We thus conclude that OCS's prioritization decisions do not preclude an active efforts finding.

**B.      OCS's Efforts To Assist Addy In Completing Her Case Plans Were Active, Rather Than Passive, Particularly In Light Of Addy's Inconsistent Engagement In Services And Resistance To OCS's Help.**

Addy argues that, even if OCS's case plans were appropriate, OCS failed to provide active efforts because she had to accomplish much of the plans on her own. Addy acknowledges that OCS arranged visitation and provided her bus passes, but she contends that OCS did not assist her in obtaining needed services. Addy argues that securing mental health treatment was left entirely to her and that OCS scheduled only one mental-health-related appointment: a neuropsychological evaluation that she had to cancel and that OCS never rescheduled. Addy also contends that OCS provided her essentially no assistance in obtaining housing or employment.

Considering OCS's efforts in their entirety,[22] we conclude that they were sufficient to cross the line from "passive" to "active." OCS made several efforts to assist Addy with developing parenting knowledge and skills, including referring her to parenting classes, arranging and helping her attend visitation with Astrid, and arranging for a nurse from the Nutaqsiivik program to attend visitation sessions. Addy's failure to consistently attend visitation and classes and to accept help from the Nutaqsiivik nurse meant that these efforts were ultimately unsuccessful.

We recognize that OCS's efforts to assist Addy with obtaining mental health services were inconsistent. Her first caseworker scheduled a neuropsychological evaluation but apparently did not assist her in completing any other mental-health-related case plan goals. Addy's second caseworker was stymied first by the inability to contact

---

[22]      *See Pravat P.*, 249 P.3d at 271.

-16-                                                                           *1733*

Addy and then by Addy's refusal to sign releases so the caseworker could talk to her healthcare providers. The second caseworker made no additional mental health referrals because Addy told the caseworker that she already was engaged in mental health services. From April 2018, when the second caseworker left OCS, through August 2018, when the termination trial occurred, OCS does not appear to have engaged in any significant efforts to assist Addy with her mental health. But OCS had difficulty contacting and meeting with Addy during this time. Addy also refused her fourth caseworker's offer to help her sign up for Medicaid, which would have allowed her to resume mental health treatment. Given Addy's claims that she already was receiving treatment, OCS's inability to contact her on a regular basis, and Addy's occasional resistance to OCS's help, we conclude that OCS's efforts in this area crossed the threshold from passive to active.

Addy's claim that OCS provided her essentially no assistance in obtaining housing or employment is supported by the record. But OCS is not required to duplicate efforts provided by other entities.[23] Until February 2017 Addy had an OPA guardian who had a duty to assist Addy with securing appropriate housing.[24] The guardian testified that Addy refused to disclose her location after Astrid's birth and the guardian was consequently unable to provide meaningful housing assistance. After February 2017 Addy moved to Fairbanks, and OCS was unable to contact her again until October. The record suggests that, when Addy returned to the Anchorage area, she no longer may have had a guardian, but rather a conservator. But the main obstacles preventing Addy's

[23]     *See Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016) ("OCS is entitled to rely on [services provided by other entities] in its active efforts if in doing so it can avoid duplicating the programs in the parent's case plan.").

[24]     *See* AS 13.26.316(c)(1).

reunification with Astrid during that time were Addy's lack of parenting skills and her abandonment of Astrid, and it was reasonable for OCS to focus on the parenting aspects of her case plan before assisting her with housing and employment.

We conclude that OCS's efforts as a whole, in light of Addy's failures to follow through with key aspects of her case plan, were active. Our primary disagreement with the dissent on this issue lies in the dissent's failure to fully address Addy's refusal to cooperate, which is intertwined with OCS's shortcomings.

## V.     CONCLUSION

The superior court's termination order is AFFIRMED.

CARNEY, Justice, dissenting.

Although I agree with the court that OCS's case plans for Addy were appropriate and reasonably designed to promote her reunification with her daughter,[1] I cannot agree that OCS made active efforts to prevent the breakup of her family. I therefore respectfully dissent.

As the court notes, OCS must tailor its efforts toward both the problem that causes the child to be in need of aid and the parent's limitations or disabilities.[2] But it did not do so.[3]

OCS was aware that Addy had been in its custody "sometime between 2009 and 2013" and that she was diagnosed with fetal alcohol spectrum disorder (FASD) in a neuropsychological evaluation in 2012 when she was 18 years old. The evaluation refers to Addy's foster mother; this seems to indicate that she was in OCS custody when it was performed. Of particular note, the report states that she functions at the level of a ten-year-old, that she performs academically at 2nd to 4th grade levels, that her functioning is impaired in virtually every aspect of life, and it provides three pages of recommendations for services and accommodations to help Addy function better.

OCS's ICWA expert, in her report in connection with the termination trial, described FASD as "a permanent and invisible physical disability with behavioral symptoms." After noting that Addy suffered from virtually all of the potential negative affects of FASD, the expert cautioned that her situation was

---

[1]     Op. at 13-14.

[2]     Op. at 13.

[3]     Although I disagree with the court's conclusion that OCS's efforts in their entirety were active, I agree with the suggestion that the period between February and October 2017 need not count against its efforts. Op. at 17.

further complicated by her borderline intellectual function, which interferes with her ability to learn and process new information, [and] stay focused and attentive . . . . Her cognitive impairments . . . affected her executive functioning . . . [and her] ability to have a healthy decision-making process. [And] she also has language impairments to further complicate her learning, reasoning[,] and expressive processes when learning information and applying it . . . daily.

And in 2015 the court determined that Addy was an "incapacitated person" and appointed a public guardian for her.[4] Yet in 2016, after appropriately responding to the concerns reported by Addy's public guardian and taking custody of Addy's baby soon after she was born, OCS simply referred Addy to services to address the issues listed on her case plan. OCS provided contact information for Mat-Su Health Services; referred her to parenting classes; and attempted to provide her with a bus pass and eventually arranged for Addy to obtain the bus pass at a bus station.

In late 2017 a second caseworker also referred Addy to parenting classes and eventually made reminder calls to encourage Addy's attendance at appointments with OCS. But when that caseworker left OCS in April 2017, she was replaced by a supervisor who only met with Addy once and never made referrals or followed up with service providers.

A fourth OCS worker obtained releases of information from Addy in June 2018 (two months before the termination trial), provided her with a bus pass, and arranged a taxi to get her to court at least once.

With the possible exception of reminder calls from the second OCS worker and the taxi arranged by the fourth OCS worker, none of OCS's efforts cross the line

---

[4] *See* AS 13.26.311(a); AS 13.26.005(5).

from "passive" to "active." In *Pravat P. v. State, Department of Health & Social Services, Office of Children's Services*, we stated:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, [a]ctive efforts [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.[5]

Despite this direction to take the client through the steps of the plan, OCS left Addy to develop her own resources after referring her to the services that it identified to address her problems.

In addition to OCS's lack of active efforts, OCS's protestations that it was unable to discern her needs without releases of information signed by Addy are unpersuasive. Addy was previously in OCS's custody; OCS's files from her case presumably were available to OCS throughout the existence of this case. The initial petition for emergency custody in this case refers to Addy's having been in the State's custody for several years. Yet there is no indication that OCS reviewed that information. Her permanent disability and its impact upon her ability to develop her own resources to bring her case plan to fruition had not changed in the few years since she was released from OCS custody.

Further, OCS could have requested a court order for more current information about Addy's mental health and needs at any time after gaining emergency custody. Addy's public guardian was the original reporter to OCS, and OCS appears to

---

[5]    249 P.3d 264, 271 (Alaska 2011) (alterations in original) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

have worked with her throughout the case.[6] Given the public guardian's obligation to ensure that Addy received the services she needed,[7] a court order could have directed the public guardian to release relevant information about those services to OCS.

As the case progressed, OCS could have sought a court order to allow it to confirm whether Addy had attended any of the services to which it had referred her. But it was not until January 2018 that OCS obtained such an order. And the order that it finally obtained was far more comprehensive than the release it had requested, and eventually obtained, from Addy: the court-ordered release listed eight treatment providers, while Addy's signed release was only for Mat-Su Health Services and her parenting class.

The court excuses OCS's "not ideal" efforts because of Addy's failures to engage or cooperate with OCS.[8] But it does not connect that failure to her FASD or to OCS's failure to "take into account [Addy's] limitations or disabilities and make any reasonable accommodations."[9] The superior court did recognize her "mental illness," but, like this court, discounted its impact on her ability to meet the expectations placed upon her; for example, the superior court noted that Addy "tends to have a lot of excuses" for missing appointments.

OCS knew that Addy, its former ward, suffered from FASD to such an extreme degree that — according to OCS's own expert — it compromised every aspect

---

[6] The public guardian's involvement was substantial enough that the court permits OCS to rely on her efforts as proof of its assistance to Addy in finding suitable housing. Op. at 6.

[7] AS 13.26.316(c)(3).

[8] Op. at 2.

[9] Op. at 13 (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1116 (Alaska 2010)).

of her daily life.  But it failed to tailor its efforts toward reunifying her family to her disability.  Because OCS's efforts were woefully passive and inadequate, I cannot agree to affirm the superior court's active efforts findings, and I dissent.