DARCY F., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–13964.

Supreme Court of Alaska.

April 22, 2011.

Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellee.

Dianne Olson, Law Office of Dianne Olson, Guardian ad litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

## OPINION

PER CURIAM.

A mother appeals the termination of her parental rights to her daughter, who qualifies for protection under the Indian Child Welfare Act (ICWA).[1] The mother has a history of severe chronic pain and other severe medical problems that led to substance abuse. The mother argues that the State of Alaska made insufficient active efforts to address the medical conditions underlying her substance abuse.

 Whether the State made active efforts as required by ICWA is a mixed question of law and fact.[2] As for the facts, we

---

1. See 25 U.S.C. § 1903(4).

2. See Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 235 P.3d 203, 210 (Alaska 2010) (quoting Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 216 P.3d 1180, 1186 (Alaska 2009)). The

review the superior court's findings for clear error.[3] As for the law, we review de novo whether the superior court's findings satisfy the requirements of ICWA.[4]

■ The mother in this case, Darcy F.,[5] argues that the Office of Children's Services (OCS) failed to make active efforts because it did not actively help her address the medical issues that caused her chronic pain and led to her substance abuse. She suggests that after a social service provider recommended she receive a medically managed detoxification, OCS should have talked to her about where to go for the detox, made referrals, or helped her to check in. She also faults OCS for not discussing pain management with her or making a referral to a pain management center, especially at the beginning of the case

when she would have had time to make more progress.

The State responds that Darcy refused until shortly before trial to provide social workers with a release of medical information that would have allowed them to communicate with health providers, that each of Darcy's case plans indicated she should go to an emergency room for detox if necessary, and that "Darcy had a lengthy history of obtaining requisite medical care and continued to obtain medical care on her own without seeking assistance from OCS." [6]

We agree with the conclusion of Superior Court Judge Philip M. Pallenberg that there is clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." [7] As Judge Pallenberg recognized

---

State must prove by clear and convincing evidence that it made "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2006).

3. *Dale H.*, 235 P.3d at 209 (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

4. *Id.* at 210 (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

5. Pseudonyms have been used throughout this opinion to protect the identities of the parties.

6. Though the record in this case does not contain medical records from earlier in Darcy's life, it is clear from Darcy's self-reporting that she has a lengthy history of obtaining medical care when needed. Darcy testified to the superior court in June 2010 that she had worked with doctors to resolve her medical problems, including kidney stones, and that she hoped to have jaw reconstruction surgery in the near future. After moving to Juneau in 2009, and thus while her case plan was in effect, Darcy traveled to Anchorage for treatment of her kidney stones and perhaps also a heart attack. She reported having reconstructive surgery on her jaw, or perhaps several surgeries, earlier in life. She also described receiving serious dental work, hospitalization for ovarian cysts, and, during her youth, admission to a mental health unit and treatment for depression and anxiety.

7. These active efforts include the following: (1) after Darcy gave birth, while she remained in the hospital in Anchorage, staff there and other so-

cial workers took numerous steps to secure future housing for her, the baby (Danielle F.), and the baby's father (Frank S.); (2) OCS assigned a secondary worker to Darcy while she remained in Anchorage to serve as a local contact; (3) OCS arranged for supervised visits between Darcy and Danielle at OCS, then at the Cook Inlet Tribal Council (CITC), with Danielle's foster care provider and a nurse helping Darcy to learn how to address Danielle's needs, until Darcy requested they stop; (4) OCS arranged for a variety of medical and therapeutic services for Danielle; (5) OCS developed a case plan for Darcy identifying specific concerns and services to address those concerns, discussed the services with Darcy, provided bus passes, and wrote a letter to assist with housing; (6) OCS repeatedly followed up with Darcy regarding her plan while she remained in Anchorage; (7) OCS reminded Darcy about her obligatory drug tests when she began missing them; (8) CITC provided a substance abuse assessment, but Darcy did not follow most of its recommendations; (9) CITC also offered access to a mother's group and employment training, neither of which Darcy used; (10) OCS continued making efforts to stay in communication with Darcy after her arrival in Juneau in January 2009, despite many obstacles, including Darcy's mother eventually saying that all future communications should be via letter, but hanging up before providing an address; (11) after reestablishing contact with Darcy in May 2009 by successfully guessing that she might be at the Bergman Hotel and leaving a message there, OCS updated her case plan and provided another letter to assist with housing; (12) OCS made numerous further efforts to arrange for substance abuse assessments, drug tests, and treatments; (13) after Darcy fell asleep and became volatile during an assessment at the Rainforest Recovery Center (RRC), OCS arranged for an

in his oral conclusions, an answer to Darcy's substance abuse problems "probably ... is going to require a solution to her physical problems." But the court accurately noted that "there have been a lot of situations where OCS has asked things of [Darcy] that weren't unreasonable that didn't happen."[8] "[O]ne can always say maybe there's one more thing we could do that would work, maybe if [Darcy] had some more time, another surgery, another medical visit might find the answer." But the court reasonably concluded that "at some point there has to be an end to that."

We join in Judge Pallenberg's view that the decision in this case does not imply a moral judgment of Darcy. As the judge concluded in his oral decision:

> I don't feel good about the result. It is a sad one. I hope that when [Danielle] is old enough to understand all of this, that she knows what I know now, which is that [her mother] loves her, that [her mother] did not give up on her, that she was not adopted because her mother abandoned her or didn't love her or didn't want her, but rather because her mom has a lot of challenges in her life that just don't make it possible for her to meet her needs.

For the reasons stated above and in the superior court's written opinion, which we attach in relevant part as an appendix, we AFFIRM the termination of parental rights.

### APPENDIX

In the Matter of:

D.F.

Date of Birth: 7/19/08

A Child Under the Age

of Eighteen (18) Years.

Case No. 1JU–08–70 CP

---

### FINDINGS, CONCLUSIONS, AND ORDER TERMINATING PARENTAL RIGHTS AND RESPONSIBILITIES[1]

#### [Darcy F.]

This matter came before the court for hearing on April 12 and 13, June 29 and July 2, 2010.

Having considered the allegations of the petition and the evidence presented, the court makes the following FINDINGS AND CONCLUSIONS, in addition to the oral findings and conclusions made on July 2, 2010, which are incorporated herein by reference.

#### FINDINGS OF FACT

Darcy F., mother of Danielle F., has a significant history of substance abuse. She has used opiates since age 17, first as prescribed for pain following a jaw reconstruction surgery, which progressed to buying opiates and other drugs on the street. During her pregnancy with Danielle, Darcy was chronically abusing street drugs, coming to her doctor's appointments with withdrawal symptoms and vomiting, which resulted in weight loss. In order to help Darcy gain appropriate weight during pregnancy, Darcy was prescribed methadone for the remainder

---

assessment at a different institution, the SouthEast Alaska Regional Health Consortium (SEARHC); (14) SEARHC then offered weekly services to Darcy, but Darcy participated only sporadically; (15) SEARHC also helped Darcy apply for residential treatment programs, explained how to get a physical and TB test, and referred her for an obligatory mental health assessment; (16) RRC offered Darcy inpatient treatment from which she was discharged for violating the program's no-smoking rules; (17) RRC admitted Darcy again for outpatient treatment; (18) and, finally, OCS continued to monitor Darcy's progress and efforts up to the beginning of the hearings by calling various service providers. The commitment of OCS's workers in this case appears exemplary.

**8.** Cf. Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 204 P.3d 1013, 1021 (Alaska 2009) ("Where services have been provided and a parent has demonstrated a lack of willingness to participate or take any steps to improve, this court has excused minor failures by the state and rejected arguments that the state could possibly have done more.").

**1.** The superior court's order has been edited to conform to our style and formatting requirements. Citations to the record have been silently omitted, and real names have been silently replaced with pseudonyms to protect the identities of the parties. Other alterations are indicated by ellipses and brackets.

of the pregnancy, with the understanding that, because she had violated previous pain [contracts], she would be prescribed no more methadone once the baby was born. In addition to the methadone prescription, Darcy was also smoking marijuana during the pregnancy, as evidenced by Danielle's urine drug screen at birth testing positive for THC.

On July 21, 2008, two days after Danielle's birth at Alaska Native Medical Center (ANMC) in Anchorage, OCS received a report about Danielle's positive drug screen for marijuana and about the methadone use during the pregnancy. Darcy was discharged from ANMC on July 24th, but Danielle remained in the hospital for the next month due to her premature birth, dependency to methadone, and significant feeding issues. Because Danielle was born addicted to methadone, her withdrawal symptoms, being jittery and inconsolable, began within her second day of life, so methadone was prescribed. While in the hospital, her doctor tried to wean Danielle off methadone three times, eventually doing a slower wean that was still occurring at the time of her discharge.

On August 28, 2008, OCS took emergency custody of Danielle because the hospital refused to discharge her to Darcy, who was assessed as an unsafe caregiver and unable to meet Danielle's high medical needs. For example, Darcy was observed to leave Danielle unwrapped after changing her diapers, to wake her up after she had been fed and settled, and to not [follow] directions from the nursing staff to let the infant rest. Also, during the rooming-in period when Darcy was supposed to stay with her child 24 hours per day and provide complete care for her child, she would be away from the room for prolonged periods of time, requiring the hospital staff to feed the baby and change diapers. When she was in the room, Darcy was observed to nod off, once nearly falling out of a rocking chair, to stumble over the infant and to fall asleep while standing up. Danielle's pediatrician ... concluded that discharging the infant to Darcy would create a "serious risk for neglect and infant death." The doctor also believed the risk was exacerbated by the likelihood that Darcy would be

cut off from prescription methadone, and that the "florid" withdrawal would result in an "untenable situation for a [newborn] infant." At the time of emergency custody, placement of Danielle with her father, Frank S., was not an option because he was homeless and unable to provide a safe home for the child or meet her medical needs. Frank subsequently relinquished his parental rights to Danielle.

For the first [eight and a half] months of custody, Danielle was placed with ... a therapeutic foster home in Anchorage ... [that] specializes in medically fragile babies. [The woman who runs the home] testified about the problems Danielle experienced while being weaned off methadone, including her inability to self-regulate and calm herself down, her extreme need for routine and an environment free of stimulation, and the diaper rash burns caused by the chemicals coming through her system during the methadone wean.

On May 13, 2009, after two eye operations that allowed her to be medically cleared to leave Anchorage, Danielle was placed in Juneau in the home of her paternal aunt and uncle.... [Her aunt] testified that although [Danielle] has made considerable improvements, she still has significant delays ... requiring weekly speech and physical therapy, and she still needs a very structured environment in order to function as well as she can. In May 2010, Danielle was placed in a new foster home in Juneau, where she remains while OCS locates a permanent foster home.

After Danielle entered state custody, Darcy remained in Anchorage for four months. While there, Darcy worked with Cook Inlet Tribal Council (CITC), [which] offered services for substance abuse, parenting, employment/training, housing, and supervised visitation. Visitation was initially twice weekly, but was decreased to once weekly because [of] the disruption it caused to Danielle, in part caused by Darcy repeatedly over-stimulating Danielle, despite instructions otherwise, by taking flash photos or changing her clothes unnecessarily during the visits. Darcy also was provided with parenting instruction during the visitations and was invited to

Danielle's medical appointments, only some of which she attended. Darcy was also offered, and provided with, monthly bus passes through OCS and a letter for housing.

After the baby was born, Darcy continued to abuse non-prescription drugs. A urine drug screen collected on September 9, 2008, was positive for marijuana/THC, cocaine, opiates, and benzodiazepines. Darcy failed to complete any of the 19 random [urine analyses (UAs)] scheduled in Anchorage thereafter. In November 2009, Frank was charged and later convicted of trying to deliver non-prescription methadone to her.

On October 30, 2008, Darcy completed her substance abuse assessment through CITC, which recommended outpatient treatment. Darcy was to begin her pre-treatment at CITC on December 1st and to enroll in Dena [A.] Coy services the following day, but she never did so.

In January 2009, Darcy moved back to Juneau in the mistaken belief that Danielle would be moving to Juneau that month. After Darcy's return, OCS provided her with monthly bus passes, payment to obtain a Rainforest Recovery Center (RRC) assessment, and payment for the random UA/hair follicle testing. OCS has also provided a letter of support to help move her higher on the waiting list for low-income housing. Darcy did obtain stable housing in September 2009. OCS was unable to offer parenting classes to Darcy because the timing of the classes did not coincide with the caseworker's ability to contact her.

[T]he OCS worker on this case ... testified that she met with Darcy in January 2009, but due to Darcy's homelessness, and unwillingness to provide contact information, the next meeting was not until May 2009. [The OCS worker] tried to meet monthly with Darcy thereafter; however, due to Darcy's trips to Anchorage, and her resistance to meeting with [the OCS worker], meetings occurred only in July and August 2009, and January ... and March 2010.

A primary goal of Darcy's case plan was to achieve sobriety, and so she was required to obtain another substance abuse assessment,

follow its recommendations, and submit to random drug testing. RRC attempted an assessment, but was unsuccessful because Darcy was falling asleep during the assessment and becoming very volatile. On July 29, 2009, Darcy completed a hair follicle/UA test, which was positive for cocaine, opiates, marijuana, and methadone. Darcy was asked to obtain additional [hair follicle/UA] testing at later dates but did not do so. [On] August 28, 2009, Darcy completed her substance abuse assessment with [a social worker at] the SEARHC Behavioral Health Clinic. Darcy told [the SEARHC worker] that she "tries to" smoke marijuana daily, even doing so the day of her assessment, and that she buys methadone on the street "as much as possible when she can afford to buy it." She also stated that she uses "more than she intended[,] trying to limit herself without success" and notices "signs of withdrawal when she tried to stop or days when she could not afford to buy it." The assessment recommended long-term inpatient treatment, and [the SEARHC worker] testified that she has worked with Darcy to get her into inpatient treatment, but that Darcy never completed the application process. Darcy did enter RRC in March [2010], but was discharged shortly thereafter for not following the non-smoking rules. She then attended outpatient treatment, but was discharged as incomplete due to her having to travel to Anchorage for [medical] issues. Darcy testified on June 29, 2010, that she has been sober for the previous six weeks and [is] attending outpatient treatment at RRC.

Another goal of Darcy's case plan was to work on the medical problems that were causing her pain and drug-seeking behavior. Darcy testified that she has been working with medical doctors, and hopes to have jaw reconstructive surgery in the near future.

After Danielle's return to Juneau in May 2009, OCS resumed weekly visitation between her and Darcy. [The OCS worker in Juneau] who supervised these visits ... testified that between July 2009 and April 2010, Darcy missed 18 of the 44 scheduled visits, was 5–14 minutes late to about a quarter of the visits she attended, and at times would leave the visit for 10–25 minutes at a time,

and a few times left the visits early. Her interaction with Danielle during the visits was unpredictable as well, which made it difficult for her and the child to bond. Darcy was frequently stressed, anxious, and physically tense during visitations, and her agitation would cause Danielle to become upset, shown by crying and at times becoming stiff as a board. Despite the attempts by [the OCS worker in Juneau] and the foster parents to make the visits as successful as possible, Darcy has not been able to bond with her child.

Darcy's participation in the court hearings concerning the termination trial was problematic. She was over [one and a half] hours late to the first day of the termination trial, and when she did appear, she had difficulty staying awake ... [and performing] basic tasks, like swallowing water without it dripping out of her mouth. She also missed a scheduling date on May 3 and a trial date on June 3, 2010.

### CONCLUSIONS OF LAW

There is no doubt that Darcy has been dealt a tough hand in life and her difficulties are not her fault. She does not take drugs to get high or to party; instead, she does so to self-medicate due to life-long medical problems, numerous surgeries on her jaw, and the resulting pain. There is also no doubt that Darcy dearly loves her child and wants to raise her; however, Danielle is almost two years old and in need of a permanent home, and Darcy remains unable to manage her own care, let alone a child with really high needs. It is hoped that Danielle will understand [some day] that Darcy loves her and did not abandon her or otherwise give up on her.

1. There is clear and convincing evidence that Danielle is a child in need of aid pursuant to AS 47.10.011(6) and (10). Danielle suffered substantial physical harm while she was withdrawing from the methadone addiction with which she was born, as evidenced by the physical pain caused by the acidity of her feces as the drug was eliminated, and the developmental delays she has experienced.

Also, Danielle is at risk of substantial physical harm due to her high needs and her mother's inability to care for her, which is in part due to Darcy's addiction to opiates and marijuana.

2. There is clear and convincing evidence that Darcy has failed within a reasonable time to remedy the conduct or conditions in the home that put the child at substantial risk of harm. This finding may create the impression of a moral judgment, but it is rather a recognition that two years have passed; although one hopes that Darcy can overcome [the] addictions and medical issues that cause her inability to care for her child, it is not likely that these conditions will change. Hope is not enough. Moreover, the outpatient treatment that Darcy is now attending is not enough to solve her problems. Fairly rudimentary things have not yet been done. There will need to be a solution to her physical problems, followed by a longer-term treatment program. Darcy cannot get to steps two to five without completing step one.

3. There is clear and convincing evidence that reasonable and active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and these efforts have been unsuccessful. Although there are always more things that could have been done, active efforts have been made to get Darcy to participate in substance abuse treatment. At some level, especially with respect to substance abuse, others cannot walk Darcy through treatment; fighting an addiction has to come from within.

4. It is contrary to the welfare of the child to return home.

5. There is evidence beyond a reasonable doubt, including the testimony of ... a qualified expert pursuant to the Indian Child Welfare Act, that return of the child to Darcy's custody is likely to result in serious emotional and/or physical damage to the child. Although one cannot predict the future with certainty, the court is convinced beyond a reasonable doubt of this likelihood.

6. The best interests of the child will be promoted by terminating Darcy F.'s parental

rights.... [A]t some point there has to be an end to the attempts to reunify. Although Danielle is not yet in an adoptive home, it may be easier to find such a home after termination of parental rights.

IT IS THEREFORE ORDERED that the parental rights and responsibilities of Darcy F. are terminated under AS 47.10.088 and that the child is committed to the custody of the Department of Health and Social Services for adoptive purposes pursuant to AS 25.23.010 et seq. or for other permanent placement. The Commissioner of the Department of Health and Social Services is authorized to consent to an adoption of this child or is authorized to consent to a guardianship.

DATED: 7/26/10

/s/ Philip M. Pallenberg

SUPERIOR COURT JUDGE