*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DENNY M., | ) |
| | )     Supreme Court No. S-15880 |
| Appellant, | ) |
| | )     Superior Court No. 3PA-13-00053 CN |
| v. | )     and 3PA-13-00054 CN (consolidated) |
| | ) |
| STATE OF ALASKA, | )     O P I N I O N |
| DEPARTMENT OF HEALTH & | ) |
| SOCIAL SERVICES, OFFICE OF | )     No. 7076 - January 13, 2016 |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Gregory Heath, Judge.

Appearances: Lars Johnson, Assistant Public Defender, and Quinlan G. Steiner, Public Defender, Anchorage, for Appellant. David A. Wilkinson, Assistant Attorney General, Fairbanks, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.     INTRODUCTION

The Office of Children's Services (OCS) filed a petition to terminate a mother's parental rights to two of her daughters. The superior court granted the petition.

The mother appeals the superior court's finding that OCS made active efforts to reunify the family, as required by state and federal law, as well as a few of the factual findings underlying this conclusion. Because the superior court did not clearly err in finding that OCS made active efforts by providing services geared toward reunification — some by OCS directly and others through the mother's involvement in a therapeutic court — we affirm the termination decision.

## II.    FACTS AND PROCEEDINGS

Denny M. is the mother of three daughters, two of whom, Tony (born in 2008) and Kam (born in 2010), are involved in this case.[1] They are Indian children for purposes of the Indian Child Welfare Act of 1978 (ICWA).[2] OCS first became involved with Denny's family in 2010, when it received a report that Denny abused alcohol and marijuana while pregnant with Kam and said she hated the baby. OCS removed Tony and Kam from Denny's care and began a trial home visit with their father, Tyler Y., who in April 2011 was given permanent custody of the girls.

On May 30, 2013, OCS removed Tony and Kam from Tyler's home after Kam "showed up at her day care provider's house with two black eyes, a blackened nose and swollen face," allegedly caused by Tyler. The next day OCS filed an emergency petition for temporary custody based on both Tyler's physical violence and Denny's mental health. OCS placed the children with their aunt, Denny's sister.[3]

---

[1]    We adopt the pseudonyms used by the parties.

[2]    *See* 25 U.S.C. § 1903(4) (2012).

[3]    In August 2013 both Tyler and Denny stipulated that the children were in need of aid. Tyler stipulated to that status under AS 47.10.011(6) (risk of physical harm) and Denny under AS 47.10.011(11) (parent's mental illness). The parents also stipulated

(continued...)

OCS developed a case plan intended to promote the family's eventual reunification. Denny started work on the plan in July 2013,[4] but her progress stopped in August when she was arrested for assaulting her father — her fourth arrest for assault since 2010. She was incarcerated until October. The disposition of her criminal case required that she participate in a variety of services provided through a therapeutic mental health court, including counseling, psychiatric care, medication management, and residence in an assisted living facility. Despite those resources, Denny was admitted to the Anchorage Psychiatric Institute (API) in December 2013, her thirteenth admission.

Beginning in February 2014, secondary OCS caseworkers in Anchorage[5] made near-monthly in-person visits to Denny to track her progress with the case plan. In March 2014, to advance one of the plan's goals, OCS referred her to Dr. Heather Macomber for a neuropsychological evaluation. Dr. Macomber diagnosed Denny with "schizoaffective disorder and post traumatic stress disorder" and made a number of recommendations. Among other things, she recommended that Denny have "ongoing psychiatric care" and "frequent appointments" with a doctor "to ensure her optimal response to psychotropic medications"; that she "maintain consistency with [her] medications to ensure her emotional stability, behavioral control, and improve her reality

---

[3](...continued)
that OCS had so far made active efforts to reunify the family and that it was in the children's best interest to remain in OCS custody. The superior court accepted the stipulation.

[4]     OCS simultaneously created case plans for Tyler and the children. But Tyler voluntarily relinquished his parental rights to Tony and Kam in June 2014.

[5]     Denny's primary caseworker was in the Matanuska-Susitna Valley, where the OCS case originated. Denny later moved to Anchorage, and OCS assigned secondary caseworkers there to continue working with her.

testing"; that she remain in assisted living and have a guardian appointed "to ensure that she is protected from legal and financial predation"; and that she undergo another psychiatric evaluation to identify "the true limitations of her parenting skills, and the ways in which her current psychiatric symptoms impact her judgment and decision making skills in the context of parenting." Denny's primary OCS caseworker, Raymond Edwards, called Denny to explain these recommendations to her; a secondary caseworker later did the same in person.

These recommendations prompted OCS to refer Denny to Dr. Melinda Glass, a clinical psychologist, in March 2014, for an evaluation of her prospects as a parent. Dr. Glass found it difficult to clarify Denny's history "due to her tangential and bizarre thinking," but she reported Denny's claims that through prayer she had learned to read, healed animals, and fixed her teeth. Dr. Glass attributed these claims to delusional thinking rather than any religious or cultural belief. Denny told Dr. Glass that her daughter had visited her in her dreams but stopped doing so when both of them "shut down." She admitted to Dr. Glass that she had frequent emotional breakdowns that led to suicidal thoughts, though she said these resolved at least temporarily with visits to API and medication.[6] She admitted that she had reconciled with Tyler, who was still in prison, but she contended that he would not have assaulted the children in her presence and would not do it again.

Dr. Glass diagnosed Denny with schizoaffective disorder-bipolar type and substance abuse but ruled out "anxiety disorder related to a history of trauma." She considered Denny's "grandiose delusions" about her "special powers" to be particularly concerning, especially when they involved her children. Dr. Glass concluded that Denny

---

[6]     Denny reported that she had been to API "so many times [she] cannot even count."

did not have the capacity to parent young children and that her long-term prognosis was poor. She concluded that Denny required a precise combination of medications and therapy to address her illness but that she had long struggled with consistency in both areas.[7] Dr. Glass noted that finding the right balance would be difficult: "[I]t could never happen or it could happen within a week or two." Regardless, Dr. Glass did not believe Denny's children could be safely returned to her care in the near future. She wrote, "[Denny] has a serious mental illness and her acting out is dangerous. The best a consistent treatment program might provide is containment . . . but this would still not make her able to protect and appropriately parent her children. [Denny] would require constant supervision." Dr. Glass testified at trial that Denny's schizoaffective disorder was "one of the hardest to manage" and unlikely to ever go away.

Following Dr. Glass's report, Denny's secondary caseworkers continued their meetings with her at the assisted living facility. But Edwards testified that OCS's last contact with Denny was in August 2014. After that, OCS mailed three certified letters to her at the assisted living facility between October 2014 and January 2015 requesting contact but received no reply. Edwards testified that he had "no indication that she's moved anywhere else."

In December 2014 OCS filed its petition to terminate Denny's parental rights. In February 2015 there was a trial, which Denny attended; the superior court terminated her parental rights in a written order in March.

---

[7]     Dr. Glass testified that "[t]he record is full of statements that she doesn't comply with her medication as given and is not consistent, and with this type of mental illness she's really got to, to have any chance of even being able to be stable and think normally, if that's possible." Exacerbating the problem, in Dr. Glass's view, was that Denny's "distrust is high and she is not entirely uncomfortable with her mental illness."

## III. STANDARDS OF REVIEW

"In a case involving the termination of parental rights, we review a superior court's findings of fact for clear error."[8]  "Findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that a mistake has been made."[9]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[10]

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[11]  Whether "the trial court's active efforts finding failed to comport with ICWA's requirements" is a question of law reviewed de novo.[12]

## IV. DISCUSSION

The main issue Denny raises on appeal is whether the superior court erred in finding that OCS made active efforts to provide resources designed to prevent the

---

[8]     *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1019 (Alaska 2012) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[9]     *Maisy W.*, 175 P.3d at 1267 (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)) (internal quotation marks omitted).

[10]     *Id.* (internal citations omitted).

[11]     *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1186 (Alaska 2009) (citing *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 600-01 (Alaska 2001)).

[12]     *Id.* (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

break-up of her family. As a subsidiary issue, she contends that the superior court made errors of fact in support of its active efforts finding.

**A.  The Superior Court Did Not Clearly Err When It Faulted Denny For Losing Contact With OCS.**

Denny argues that the superior court clearly erred when it found that she moved from the assisted living facility in August 2014 without giving OCS a forwarding address. The superior court found, based on the testimony at trial, that the secondary caseworker "visited [Denny] at her residence in Anchorage each month; but, beginning in August 2014, [OCS] struggled to contact her. In response, [OCS] mailed three letters certified, the last one on January 29, 2015. The letters requested that [Denny] contact the caseworkers for further support." The court concluded that "[t]he monthly visits by the caseworker and the caseworker's inability to contact [Denny] on those occasions tends to show that [Denny] has moved from her assisted living facility without providing a forwarding address to her new place of residence."

The evidence about whether Denny moved is unclear,[13] but we conclude that whether the superior court erred in that finding is immaterial. The important point in the context of the active efforts analysis was not whether Denny moved but whether she could be faulted for the loss of contact with OCS. "[A] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the

---

[13]    The trial transcript shows Denny's primary caseworker, Edwards, testifying, "She has moved. She didn't notify me." He later testified, "As far as [I] know, she's still receiving cab vouchers from OCS to the same address. . . . I have no indication that she's moved anywhere else." The trial court could reasonably have understood Edwards's testimony on this point in different ways. But as explained above, any difference is immaterial to the relevant question of whether Denny may be faulted for the loss of contact.

[S]tate has taken active efforts."[14] The superior court's other relevant factual findings — about the OCS caseworkers' near-monthly visits to the assisted living facility, their last visit in August 2014, and the three unanswered certified letters between October 2014 and January 2015 — are supported by the evidence and are sufficient without more to show that Denny could be faulted for the loss of contact. If the superior court did err in finding that Denny moved, the error was harmless.[15]

B.     **The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That OCS Made Active Efforts Toward Reunification.**

Denny's primary argument on appeal is that "[g]iven the possibility that [she] could have rapidly improved, the trial court erred in concluding that OCS made active efforts to prevent the break-up of the family." She essentially concedes the gravity of her mental health issues but argues that OCS failed to adequately address them, in part by passively relying on the therapeutic mental health court to provide many of the necessary services. But we conclude that the evidence supports the superior court's finding of active efforts.

---

[14]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015) (first alteration in original) (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002)).

[15]     Denny also contends that it was unreasonable for the court to note in its decision, and apparently to hold against her, the fact that she "was unable to appear in person at any of her meetings with OCS and court proceedings in this matter; she only appeared by telephone." But as Denny acknowledges, the court was aware that "Denny lived in Anchorage while [OCS] meetings were in Palmer" and that it is "common for clients to attend meetings telephonically." In our view, the court's brief reference to Denny's telephonic participation cannot reasonably be read as anything other than a minor, neutral detail in the explanation of how contact between Denny and OCS was eventually lost.

"In a termination proceeding involving Indian children, the superior court must find, by clear and convincing evidence, that the State has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful."[16] The superior court analyzes OCS's active efforts on a case-by-case basis.[17] "Although there is 'no pat formula . . . for distinguishing between active and passive efforts,' we have recognized that what is critical is OCS's involvement with a parent after it has drawn up the parent's case plan."[18] Generally, "OCS makes active efforts . . . when it helps the parents develop the resources necessary to satisfy their case plans, but its efforts are passive when it requires the parents to perform these tasks on their own."[19] "The court should look to OCS's involvement in its entirety, and may consider a parent's demonstrated

---

[16] *Philip J. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013) (citing 25 U.S.C. § 1912(d) (2012)); *see also* CINA Rule 18(c)(2)(B).

[17] *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021 (Alaska 2009).

[18] *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188 (Alaska 2009) (alteration in original) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[19] *Sylvia L.*, 343 P.3d at 432 (quoting *Sandy B.*, 216 P.3d at 1188); *see also* *A.A.*, 982 P.2d at 261 ("Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own." (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984))).

unwillingness to participate in treatment as a factor . . . ."[20] But "an analysis of the [S]tate's active efforts is not limited to efforts by OCS"; the court may consider services provided by other state entities such as the Department of Corrections.[21] The services provided through the specialized therapeutic courts of the Alaska Court System — wellness courts, mental health courts, and veterans courts — can also be an important part of a troubled parent's recovery. OCS is entitled to rely on those services as well in its active efforts if in doing so it can avoid duplicating the programs in the parent's case plan.

The superior court found by clear and convincing evidence that "OCS made timely, active efforts" to prevent the breakup of Denny's family. It commended OCS for appointing a secondary caseworker to maintain in-person visits with Denny in Anchorage after she moved there from the Valley. It noted that "OCS paid for cab vouchers to all referred services and visitation" because of Denny's inability to "navigate the bus system." It highlighted the referral to Dr. Macomber, with OCS covering the cost, and the caseworkers' follow-up discussions of the doctor's recommendations with Denny "in person and at length." The court noted that OCS also followed up on Dr. Macomber's recommendations by referring Denny to Dr. Glass "for a psychological evaluation specific to [Denny's] ability to parent." The court noted that OCS again

---

[20] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011) (citing *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)) (internal quotation marks omitted); *see also Sylvia L.*, 343 P.3d at 432 ("In determining whether OCS made active efforts, the trial court may consider all services provided during the family's involvement with OCS; it need not focus on a distinct period of time.").

[21] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).

"covered the cost" and that Edwards gathered all of Denny's "past mental and physical health records" from API and other institutions and "spent a prolonged amount of time distilling that information into a set of records and documents specifically tailored to Dr. Glass's request for information." The court noted that Edwards prepared a list of questions that would help Dr. Glass directly address Dr. Macomber's concerns about Denny's parenting abilities and that, after Denny failed to appear for her first appointment with Dr. Glass, Edwards rescheduled it and "coaxed [Denny] into attending." The court also took note of Denny's involvement with a therapeutic court, "the Community Resources Project," and its provision of services that OCS was not required to duplicate. Finally, the court noted that OCS set up monthly visitation between Denny and her daughters and referred Denny to a family therapy counselor "to establish a visitation plan." And, as discussed above, the court concluded that Denny's eventual disengagement from OCS assistance was due in large part to her own failure to respond to the agency's attempts to contact her.

Denny contends that these efforts were not enough, first because they failed to focus on stabilizing her mental health issues; this in turn, she contends, would have aided her ability to parent and given her a more realistic perspective on Tyler's destructive influence in her life. Denny points out that she attended the psychological evaluations to which OCS referred her and that she was willing to pursue some, though not all, of the doctors' recommendations. She argues that "OCS should not have given up on the possibility of [her] becoming a safe parent."

But the superior court's findings that Denny's mental health problems are of long standing, and that she has done little to address them, are supported by the record. The court noted that Denny's delusions occasionally included her children and that, because of her inconsistency with both medication and therapy, her poor prognosis

suggested that change in the near future was unlikely. In its discussion of the children's best interests the court found that they were bonded to their maternal aunt, not to Denny. The court further found that "[t]he children require stability and consistency to overcome the emotional deficit created by their parents' conduct" and that they "should not wait any longer for a permanent and loving home, a home that [Denny] cannot provide."[22] We have repeatedly observed that a "child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid";[23] the court appropriately applied that principle here.

---

[22]     Although OCS's primary concern was Denny's mental health, it had two others that could theoretically be addressed independently: her parenting abilities and her financial stability. The superior court made no findings about whether OCS helped Denny address her financial situation (other than paying for services) or whether it actually referred her to a parenting class, and Denny cites OCS's failures in these areas in her brief. But OCS's priority was to manage Denny's mental health problems, for which she had come to OCS's attention twice before. It is clear from the record, and Denny concedes, that her mental health was the major obstacle to improvement in other aspects of her life, and the superior court could reasonably accept OCS's prioritization of its concerns. We have previously held that when a parent receives "a number of referrals from the state for services," OCS's failure to make others need not be fatal. *Thomas H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 184 P.3d 9, 17 (Alaska 2008) ("[W]hile the trial court acknowledged that OCS should have referred Thomas to a mental health provider following its November 20, 2006 case plan, the court also found that Thomas's own actions . . . would have frustrated the success of any OCS services. Furthermore . . . Thomas received a number of referrals from the state for services . . . ."); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (holding that OCS's failure to make active efforts for part of the case was "insignificant in light of the extensive remedial efforts the state has provided throughout its involvement").

[23]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 954 (Alaska 2013) (quoting *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010)).

Denny also faults OCS for passively relying on the services provided by the mental health court without following up to make sure those services were working. Denny's primary caseworker, Edwards, was unsure whether OCS ever communicated with Denny's therapeutic court providers apart from the staff at the assisted living facility, though he testified he did receive some of their records. We have repeatedly stated that OCS's "efforts need not be perfect; they need only be reasonable under the circumstances."[24] Denny received extensive resources directly from OCS, including case planning, frequent and in-person support from caseworkers, monthly therapeutic visitation with her daughters, and referrals for both neuropsychological and psychological evaluations. Though our record lacks a full description of the services ordered by the therapeutic court, Denny does not dispute that these services were also provided. And there is no evidence that any deficiencies in coordination between OCS and the court-ordered services damaged Denny's prospects as a parent.

Denny also argues that many of the services the court cited as showing OCS's active efforts — psychological assessments, cab fare, collecting medical records, arranging visitation — are "unremarkable," because those are the services OCS ordinarily provides in these cases. But regardless of whether OCS put in *extra* efforts, what matters is whether its efforts were reasonable under the circumstances. We conclude that the superior court's decision of this issue was well supported by the record and that it did not err in finding that OCS satisfied the active efforts requirement.

## V.    CONCLUSION

For these reasons, we AFFIRM the judgment of the superior court.

---

[24]    *Sylvia L.*, 343 P.3d at 432.