NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

CLIFF L., )
)
    Appellant, )
)
 v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH )
& SOCIAL SERVICES, OFFICE )
OF CHILDREN'S SERVICES, )
)
    Appellee. )
_____ )

Supreme Court No. S-16185

Superior Court No. 3AN-14-00056 CN

MEMORANDUM OPINION
AND JUDGMENT*

No. 1593 - August 10, 2016

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Lars Johnson, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Ruth Botstein, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee. Anita L. Alves, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices.

_____

 \*   Entered under Alaska Appellate Rule 214.

## I.  INTRODUCTION

The superior court terminated a father's parental rights to his four-year-old daughter.  The father appeals, challenging only whether the State made active efforts toward reunification of the family.  We conclude that the superior court's findings are not clearly erroneous and therefore affirm the order terminating the father's parental rights.

## II.  FACTS AND PROCEEDINGS

Cliff L. is the father of Claire,[1] who was born in 2011 and is an Indian child within the meaning of the Indian Child Welfare Act of 1978 (ICWA).[2]  Claire's mother, Ellen, relinquished her parental rights on the first day of trial and is not involved in this appeal.

Cliff has an extensive criminal record and at the time of trial had been incarcerated for approximately three of Claire's four years.  He acknowledged that his troubles with the law stemmed from his substance abuse.  He has used alcohol and drugs regularly since childhood and has been diagnosed with severe disorders involving his use of both alcohol and marijuana.

Even when Cliff was not imprisoned, Claire was rarely in his care.  The Office of Children's Services (OCS) took custody of Claire just three months after her birth because of substance abuse and domestic violence in the home, placing her and her mother in residential treatment.  But after they left the program, OCS removed Claire from her mother's care on an emergency petition when it found on one visit that there

---

[1]    We use pseudonyms throughout this opinion to protect the family's privacy.

[2]    *See* 25 U.S.C. § 1903(4) (2012).

were no sober adults in the home. In February 2014 Claire was placed in foster care, where she has been since.

OCS first created a family case plan when Claire was six months old. Although Cliff was incarcerated at the time, the plan recommended a variety of services for him, including substance abuse assessments. The assessments recommended residential treatment, but there is no evidence that Cliff followed through with it; he reported entering residential treatment once but leaving early. He also reported completing anger management classes while incarcerated, but one of his assault convictions came later.

OCS offered Cliff other services as well. He testified that he "stayed in contact" with his OCS caseworker, Cynthia Ontiveros, while he was incarcerated, and they developed a case plan together the first month she was assigned his case. She referred Cliff to Jett Morgan (a provider of addiction treatment services), set up weekly visits with Claire, and gave him a list of meetings for Alcoholics Anonymous (AA) and Narcotics Anonymous (NA). Ontiveros also provided Cliff with phone cards for staying in touch with Claire, but she discontinued them after discovering he was using them to call other people. She eventually referred Cliff to the two-year Chanlyut program, an intensive "basic life skills" program that would require him to work for his room and board and remain isolated from outside contact for at least eight months of the two-year term. Ontiveros testified that Chanlyut was scheduled to pick Cliff up to begin the program upon his release from a halfway house in June 2015, but Cliff told them "that he had other things he needed to get done first and he would contact them when he was . . . ready to go into the program."

Ontiveros gave Cliff bus passes to use whenever he was not in custody. She talked to him about potentially helpful services on the outside such as Father's

Journey, a parenting skills and support program. She encouraged him to stay in touch with his attorney and to use the recommended services, which included help with finances and homelessness. Both Jett Morgan and Father's Journey, however, required clients like Cliff to arrange their own intake even if referred by OCS. Cliff conceded that when out of prison he did not take advantage of any of the services OCS recommended, explaining that he "was still homeless . . . filthy, dirty, and stinky," and "not only that, [he] was . . . drunk most of the time." In fact, Cliff was out of prison from late May until late November 2014 but was out of contact with OCS until December, after he was reincarcerated. The January 2015 family case plan then required that he "maintain contact with [OCS] to make [it] aware of his whereabouts."

During much of OCS's involvement in Claire's case Cliff had supported her placement with and eventual adoption by the family who had adopted his other four children. But that family decided that Claire would do better elsewhere, and in July 2015 Claire was moved to preadoptive placement with another family. Claire's health and behavior then showed great improvement. But Cliff was uncomfortable with this new placement because "it's kind of too soon" — he felt that he had not yet had time to get to know the second family as he had the first.

The State petitioned to terminate Cliff's parental rights in April 2015. At trial Cliff acknowledged that he was not yet fit to parent Claire, but he argued that he should be given more time before termination. He testified that he was "planning to enroll straight into the Chanlyut program" upon his scheduled release from prison.[3] But the superior court found Claire to be a child in need of aid under AS 47.10.011(1) (abandonment), (2) (incarceration), (4) (lack of medical treatment), and (10) (habitual

---

[3]     The assistant director of the Chanlyut program testified at trial that Cliff had sent a letter requesting admission to the program about a week and a half earlier.

intoxication). The court noted Cliff's new willingness "to get into this Chanlyut program and finally address his long-standing substance abuse issues," but it found this to be "too little, too late." The court terminated Cliff's parental rights.

Cliff filed this appeal, arguing only that the State did not make active efforts "to prevent the breakup of the Indian family."[4]

## III. STANDARD OF REVIEW

"In a case involving the termination of parental rights, we review a superior court's findings of fact for clear error."[5] "Findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that a mistake has been made."[6] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[7]

---

[4] 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[5] *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 348 (Alaska 2016) (quoting *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1019 (Alaska 2012)).

[6] *Id.* (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[7] *Id.* (quoting *Maisy W.*, 175 P.3d at 1267).

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[8] "Whether 'the trial court's active efforts finding failed to comport with ICWA's requirements' is a question of law reviewed de novo."[9]

## IV. DISCUSSION

### The Superior Court Did Not Err In Finding That OCS Made Active Efforts to Reunify the Family.

The superior court made the findings necessary for termination of a parent's rights to an Indian child:[10] that Claire was a child in need of aid; that Cliff had not remedied, within a reasonable time, the conditions placing Claire at substantial risk of injury; that the termination of Cliff's parental rights was in Claire's best interests; that Claire was likely to suffer serious harm if she remained in Cliff's custody; and that OCS made active but unsuccessful efforts to provide remedial and rehabilitative programs designed to prevent the breakup of the Indian family. Cliff's argument on appeal focuses on OCS's active efforts, which he argues were inadequate because the agency did not try hard enough to keep track of his whereabouts, did not work closely enough with him while he was incarcerated, did not help him with his most significant needs when he was not incarcerated, and "merely suggested resources [he] could avail himself of rather than actively helping him to take advantage of them."

---

[8] *Id.* (quoting *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1186 (Alaska 2009)).

[9] *Id.* at 348-49 (quoting *Sandy B.*, 216 P.3d at 1186).

[10] *See* CINA Rule 18(c).

Whether OCS made active reunification efforts is assessed on a case-by-case basis.[11] The agency's efforts need not be perfect to "cross[] the threshold between passive and active."[12] Generally, OCS "makes active efforts to reunite a family when it helps the parents develop the resources necessary to satisfy their case plans, [and] its efforts are passive when it requires the parents to perform these tasks on their own," but there is no formula for determining the efforts' sufficiency.[13] OCS is not relieved of its active-efforts burden by a parent's unwillingness to cooperate, but the parent's attitude is nonetheless relevant to determining whether the burden has been met.[14] And "[a] parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement."[15] Finally, OCS's efforts are evaluated "in light of the totality of [its] efforts during its involvement with [the] family."[16]

Cliff first illustrates his charge of inadequate efforts by citing a visit with Claire that was missed because the OCS caseworker did not know he had been released from the halfway house where he had been staying.[17] Cliff contends that OCS should

---

[11] *Denny M.*, 365 P.3d at 350 (citing *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021 (Alaska 2009)).

[12] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[13] *Sandy B.*, 216 P.3d at 1188.

[14] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009).

[15] *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

[16] *Sandy B.*, 216 P.3d at 1188-89.

[17] Cliff also states that "the main OCS worker on the case[] was unsure when
(continued...)

have used a more accurate database to keep track of him.[18]  But a single missed visit, even if OCS's fault, does not show the inadequacy of OCS's efforts, which we evaluate in their entirety.[19]  The evidence supports a conclusion that other missed visits were Cliff's fault.[20]  And even an up-to-date database showing that Cliff had left the halfway house would not show where he had gone unless Cliff took it upon himself to give out that information.  The family case plan required Cliff to keep OCS informed of his whereabouts, but the evidence shows little consistency on Cliff's part in meeting this requirement.  The superior court faulted Cliff generally for the visits he missed while not in custody, noting that "visits pretty much only occurred consistently when [Cliff] was in custody, because he's a captive audience."  The evidence supports this finding.

Cliff blames his lapses in contact with OCS during the times he was not incarcerated on the agency's lack of initiative.  We recently observed that when communication breaks down between OCS and a parent, "[t]he important point in the context of the active efforts analysis [is] . . . whether [the parent can] be faulted for the

---

[17](...continued)
DOC released Cliff from custody."  But the transcript shows only that Ontiveros could not recall Cliff's exact release date when she was asked at trial.

[18]        No information about Cliff's suggested alternative database is in the record.

[19]        *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008) (affirming termination even though the State conceded it made no active efforts for three months of the three-year case).

[20]        An OCS caseworker testified about one visit that had to be cancelled due to Cliff's failure to call ahead, which OCS required after his repeated failures to show up for visits.  Another visit was put off a week to spare Claire trauma when Cliff and Ellen both arrived with visible bruises; Cliff did not appear for the rescheduled visit.  And Cliff's visitation privileges at his halfway house had been revoked a week before trial because he intimidated an OCS employee during a visit and had to be escorted from the visitation room by security.

loss of contact with OCS."[21]  Cliff knew how to contact Ontiveros, but the reverse was not true; except when he was incarcerated, she did not have a contact number for him, "had no way to determine where he was staying," and never received a message from him.  Cliff testified that when he lost contact with OCS he was "drunk most of the time" and homeless, and he suggests that OCS should have contacted local shelters and soup kitchens to find him.  But we have never held that "active efforts" requires OCS to track down parents who do not want to be engaged.[22]  And Ontiveros did attempt to address Cliff's basic needs for housing and self-sufficiency by, for example, referring Cliff to the Chanlyut program, which was prepared to house him for two years while he learned basic life skills; the lack of follow-through was Cliff's choice.

Finally, substantial evidence contradicts Cliff's argument that OCS "[m]erely point[ed] Cliff toward available resources" and failed to help him take advantage of them.  Soon after OCS filed its emergency petition, Ontiveros met with Cliff, developed a case plan, set up visitation, and suggested a panoply of services that included following up on the recommendations of a recent substance abuse assessment, participating in parenting classes, urinalysis testing, and attending AA and NA meetings. Two programs to which OCS referred Cliff required applicants to show commitment by scheduling their own intake appointments; OCS did what it could by making the referrals, after which Cliff declined to participate.  Ontiveros contacted the Chanlyut program to see whether it would accept Cliff, took the paperwork to him at his halfway

---

[21]     *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 349 (Alaska 2016).

[22]     *See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1022 (Alaska 2009) (affirming termination where OCS communicated with the parent only while he was incarcerated because "he made no attempt to provide [OCS] with contact information").

house, explained it to him, and later called Chanlyut to check on Cliff's follow-through; again, OCS did what it could before Cliff chose not to participate.[23] Indeed, the evidence shows that Cliff never substantively engaged in any program recommended by OCS, dating back to the 2011 family case plan.[24] The superior court could reasonably conclude, based on this record, that OCS failed to reunify the family only because Cliff himself was not committed to that goal.

## V. CONCLUSION

Because the superior court did not err when it found that OCS made active efforts to reunite the family, we AFFIRM the order terminating Cliff's parental rights.

---

[23] Cliff argues that "if OCS had taken more steps with [him] while he was incarcerated, [he] might have begun the Chanlyut program sooner." But he chose not to start the program even though his parental rights were at stake. *See A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 262-63 (Alaska 1999) (finding that a father's failure to participate in his case plan occurring after the State filed its termination petition "demonstrated failure to participate in treatment . . . even after he recognized that his parental rights were at stake").

[24] *See Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188-90 (Alaska 2009) (holding that OCS's efforts before a child's birth are relevant where there is no gap between CINA proceedings for the previous case and the current case and OCS's prior "extensive efforts . . . did not effect a change in the parents' conduct toward any of their children").