NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHARLOTTE K., | ) | Supreme Court No. S-17088 |
| | ) | |
| Appellant, | ) | Superior Court Nos.: 3PA-14-00082 CN |
| | ) | 3PA-14-00083 CN |
| v. | ) | 3PA-15-00103 CN |
| | ) | 3PA-16-00122 CN |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S | ) | AND JUDGMENT* |
| SERVICES, | ) | |
| | ) | No. 1725 – June 19, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Chris Peloso, Juneau, for Appellant. Anna Jay, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

The superior court terminated a mother's parental rights to her four children. The mother challenges the court's finding that the Office of Children's Services (OCS) made active efforts to prevent the breakup of the family as required by Alaska's Child in Need of Aid laws and the Indian Child Welfare Act, arguing that

---

\*        Entered under Alaska Appellate Rule 214.

OCS's failure to help her pursue medication management of her mental illness made its efforts insufficient. But viewing OCS's efforts in their entirety — as we are required to do — we conclude that the superior court did not err when it found that OCS made active efforts to prevent the breakup of the family.

## II.   FACTS AND PROCEEDINGS

Charlotte K. is the mother of four children subject to the Indian Child Welfare Act (ICWA):[1] Eric, Sarah, Adam, and Lawrence.[2] Eric and Sarah have been in OCS custody since July 2014, Adam since his birth in May 2015, and Lawrence since his birth in May 2016. Charlotte's long history of mental illness and domestic violence forms the background of this case.

Charlotte was diagnosed with bipolar disorder as a child following displays of severe mood swings and angry, aggressive, and oppositional behavior. She was given medication as a teenager to help address her mental health problems but discontinued it when she first became pregnant in 2012. Her history includes a number of instances of self-harm and suicide threats; she once cut her wrist so severely she needed surgery to repair the tendon and nerves. She consistently claimed, however, that she was not actually serious about killing herself. Domestic violence also featured in Charlotte's relationships; she was both victim and perpetrator in incidents involving her husband Eli S. and her later partner Oliver N., and a woman Oliver had been seeing was granted a long-term protective order after alleging that Charlotte sent her threatening text messages and threw rocks through her windows.

---

[1]      25 U.S.C. § 1903(4) (2018) (defining "Indian child").

[2]      We use pseudonyms to protect the family members' privacy. Eli, the father of Eric and Sarah, has not appeared in the case, and Oliver, the father of Lawrence, is a party to a separate appeal. Adam's father has not been conclusively identified.

OCS first received reports about Charlotte's family in July 2013. OCS's first protective action plan, intended to ensure the children's safety, followed one of Charlotte's suicide threats in June 2014. Three successive protective action plans failed quickly because of conflict between Charlotte and the selected visitation supervisors. OCS took custody of Eric and Sarah in late July 2014 after finding Sarah in the care of Eli and his brother, who had been smoking marijuana and were unable to give coherent answers to basic questions. Sarah was lying on the couch with her diaper and clothing soaked through with urine.

OCS developed a case plan requiring Charlotte to participate in parenting classes, a family violence program, and a psychological evaluation, and to follow through on any recommended individual therapy. In July 2014 OCS arranged for a neuropsychological evaluation from Dr. Skip Hrin. Dr. Hrin diagnosed Charlotte with intermittent explosive disorder and recommended cognitive-behavioral therapy and "[m]edication management/evaluation to address symptomology of Mood Symptom Disorders."

OCS referred Charlotte to Dr. Melinda Glass for another psychological evaluation in July and August 2015. Dr. Glass's conclusions were not hopeful; she reported that Charlotte's difficulties with violence, dangerous choices, and denial were chronic and that her "rigid level of defensiveness mitigates against change." Dr. Glass noted Charlotte's refusal to take medication and recommended "[t]reatment as close to dialectical behavior therapy [DBT] as possible."

Charlotte was again evaluated later that year by Dr. Bruce Smith on the referral of her attorney. Dr. Smith had evaluated Charlotte once before, in 2010. He concluded that Charlotte had persistent depressive disorder, generalized anxiety disorder, intermittent explosive disorder, ADHD, and mixed compulsive and histrionic personality features. He recommended counseling, particularly a counselor with an understanding

of DBT, and a referral for a psychiatric consultation to explore medication management of Charlotte's "ADHD inattentive type and [her] emotionality." While he thought that this treatment might give Charlotte the potential to parent her children, his "prognosis [was] guarded" based on the "duration of her behavioral issues . . . and the continuation of highly emotional decisions and reactions on her part that include threat of harm and quick escalation to verbal or physical altercations with others."

In April 2016, on OCS's referral, Charlotte began receiving therapy from a DBT-trained therapist. Charlotte attended her weekly therapy sessions fairly regularly until she stopped going in January 2018.

OCS facilitated a number of other services besides the psychological evaluations and therapy. Charlotte completed three different parenting programs. She obtained a substance abuse assessment in the spring of 2017, receiving a diagnosis of mild alcohol and cannabis use disorders, but in the follow-up UAs had an inconsistent history of both attendance and results. OCS arranged for a peer navigator through Alaska Youth and Family Services to help Charlotte coordinate her treatment and services and provide weekly parent coaching. OCS arranged for Charlotte to visit the children three times a week: one day with all four children, one with the older two, and one with the younger two. OCS helped with transportation when Charlotte had car trouble, providing her with cab vouchers or transporting the children to the meeting spot. But Charlotte's adherence to the visitation schedule was inconsistent, and this led to suspension of the visits by June 2017.

A termination trial was held over four days in January and March 2018 involving the testimony of over a dozen witnesses, and the court issued written findings of fact and conclusions of law in April, terminating Charlotte's parental rights. As relevant to this appeal, the court found that OCS had made active efforts over the entirety

of the case to prevent the breakup of the family. Charlotte appealed the termination, challenging only the active-efforts finding.

## III.   STANDARDS OF REVIEW

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[3] We review a trial court's factual findings for "clear error."[4] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[5] "Whether 'the trial court's active efforts finding failed to comport with ICWA's requirements' is a question of law reviewed de novo."[6]

## IV.   THE ENTIRETY OF OCS'S REHABILITATIVE EFFORTS SATISFIES THE ACTIVE-EFFORTS STANDARD.

"In a termination proceeding involving Indian children, the superior court must find, by clear and convincing evidence, that the State has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful."[7] Charlotte argues that one aspect of OCS's active efforts was insufficient: its failure "to help guide [her] towards

---

[3]    *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 348 (Alaska 2016) (quoting *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1186 (Alaska 2009)).

[4]    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269 (Alaska 2011).

[5]    *Id.* at 269-70 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 209-10 (Alaska 2010)).

[6]    *Denny M.*, 365 P.3d at 348-49 (quoting *Sandy B.*, 216 P.3d at 1186).

[7]    *Id.* at 350 (quoting *Phillip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013)); *see also* 25 U.S.C. § 1912(d).

medication management, a critical component of her mental health treatment." She points out that Dr. Hrin recommended evaluation for medication management as part of his neuropsychological evaluation in 2014; Dr. Glass "again discussed medication management" in the context of her evaluation of Charlotte in August 2015 (though Dr. Glass's only treatment recommendation was for DBT); Dr. Smith "recommended a referral for psychiatric consultation to 'explore medication' " as part of his evaluation in December 2015; and "[t]hroughout this time, [Charlotte's] therapist . . . was also encouraging her to explore medication." OCS's response is twofold: first, that Charlotte had made it obvious that "she was not interested in taking medication"; and second, that Charlotte "had the means to obtain medication, yet she chose not to do so," based on her therapist's unfollowed advice that Charlotte ask her primary health care provider about anxiety medication.

The Bureau of Indian Affairs (BIA) has defined active efforts to mean "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[8] We have emphasized the difference between active and passive efforts:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, [a]ctive efforts [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.[9]

The record supports Charlotte's argument that OCS recognized the need to explore medication as a way of addressing her mental health issues; it also knew of the psychologists' recommendations that Charlotte should be referred for a psychiatric

---

[8]    25 C.F.R. § 23.2 (2018).

[9]    *Pravat P.*, 249 P.3d at 271 (alterations in original) (quoting *Dale H.*, 235 P.3d at 213).

evaluation and, potentially, medication management. The primary OCS worker nonetheless testified that she never discussed medication management with Charlotte. She explained that she "more or less left that to [the therapists] to discuss" with Charlotte; she also noted there was information in Charlotte's file indicating that she did not want to take medication.

The superior court found that Charlotte "was provided a copy of Dr. Smith's report" and that her "therapist encouraged her to explore medication." But expecting Charlotte to act on the psychologists' recommendation or the therapist's encouragement, without specific OCS direction or follow-through, is passive and does not meet the active efforts standard. The superior court also found that Charlotte "was unwilling to take medication because she [was] of 'child bearing age,' " and OCS correctly notes that it cannot force an unwilling parent to participate in a particular treatment and that the "parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the [S]tate has taken active efforts."[10] But Charlotte testified that, although she believed she had been advised that she did not need medication, she was willing to explore psychiatric intervention if there was a referral. The court did not have to accept this testimony as true.[11] But OCS's failure to discuss medication management with Charlotte meant that her willingness to pursue it was not put to the test.

---

[10] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

[11] *See Dara S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 426 P.3d 975, 989 (Alaska 2018) ("It 'is the function of the trial court . . . to judge witnesses' credibility and to weigh conflicting evidence.' " (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001))).

However, our active-efforts inquiry does not end even if we assume that OCS failed to adequately pursue medication management with Charlotte. We evaluate OCS's efforts by looking at its "involvement in its entirety"[12] over the course of the case.[13] Charlotte concedes that OCS provided extensive visitation, transportation assistance, parenting and domestic violence classes, substance abuse assessment and monitoring, a peer navigator, multiple psychological evaluations, and years of therapy, including almost two years of dialectical behavioral therapy (the psychological evaluations' primary recommendation). These efforts were clearly active.

Charlotte emphasizes what she contends to be the overriding importance of medication management; she argues that while OCS failed only with regard to this one service, it was the key to her recovery. We note, however, that the superior court did not mention, let alone rely on, Charlotte's failure to take medication when explaining why it was in the children's best interests to terminate Charlotte's parental rights. The court noted in particular Charlotte's "emotional reactivity, drug use, and choice of partners." The primary recommendation for addressing her emotional reactivity was DBT, which OCS provided without seeing much improvement.

We conclude that the superior court did not clearly err in its factual findings or err in concluding that OCS's efforts to prevent the breakup of Charlotte's family, when viewed in their entirety, meet the active-efforts standard required by ICWA.

---

[12]     *Maisy W.*, 175 P.3d at 1268.

[13]     *See Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015) ("In determining whether OCS made active efforts, the trial court may consider all services provided during the family's involvement with OCS; it need not focus on a distinct period of time.").

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Charlotte's parental rights.